**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTY KESSLER, Derivatively on Behalf of ARBOR REALTY TRUST, INC., | Case No. |
| Plaintiff, | |
| v. | |
| IVAN KAUFMAN, PAUL ELENIO, KENNETH J. BACON, CARYN EFFRON, EDWARD FARRELL, WILLIAM C. GREEN, MELVIN F. LAZAR, JOSEPH MARTELLO, and ELLIOT SCHWARTZ, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ARBOR REALTY TRUST, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Marty Kessler ("Plaintiff"), by and through the undersigned counsel, derivatively on behalf of and for the benefit of Nominal Defendant Arbor Realty Trust, Inc. ("Arbor," or the "Company"), submits this Verified Shareholder Derivative Complaint against Ivan Kaufman ("Kaufman"), Paul Elenio ("Elenio"), Kenneth J. Bacon ("Bacon"), Cary Effron ("Effron"), Edward Farrell ("Farrell"), William C. Green ("Green"), Melvin F. Lazar ("Lazar"), Joseph Martello ("Martello"), and Elliot Schwartz ("Schwartz") (the "Individual Defendants" and together with Arbor, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff alleges the following based upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of the Company's filings with the United States Securities and Exchange Commission ("SEC"), news articles, press releases, conference call transcripts, analysts' reports, and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought against certain current and former Arbor officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants from May 7, 2021 through July 11, 2024, both dates inclusive (the "Relevant Period"), and which caused substantial damage to the Company and its shareholders.

2.     Arbor is a real estate investment trust ("REIT") that provides loan origination and servicing for multi-family, commercial, and healthcare properties. The Company's operations are divided into its two business segments: (1) its Agency Business and (2) its Structured Business.

3.     Throughout the Relevant Period, Company leadership issued statements that were

materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Arbor failed to maintain adequate underwriting standards and disregarded its own stated guidelines; (ii) as a result, the Company originated a high volume of loans that were at a heightened risk of default; (iii) in violation of GAAP, Arbor failed to record adequate current expected credit loss ("CECL") to account for the Company's deviations from its underwriting standards; (iv) as a result, Arbor's reported net income was materially overstated throughout the Relevant Period; (v) Arbor lacked adequate internal controls; and (vi) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis.

4.     On November 16, 2023, Viceroy Research Group ("Viceroy") issued a report, revealing the Company's inadequate underwriting standards and extension of bridge loans to syndicators who lacked real estate investment backgrounds.

5.     On this news, the price of Arbor stock declined 11.56% in one day, from a close of $13.84 per share on November 15, 2023 to a close of $12.24 per share on November 16, 2023.

6.     On May 9, 2024, Viceroy published another report, revealing that Arbor had fraudulently overstated the value of its loan book through undisclosed, off-balance sheet, related party transactions.

7.     On this news, the price of Arbor stock declined 4.9% in one day, from a close of $13.50 per share on May 8, 2024 to a close of $12.84 per share on May 9, 2024.

8.     Then, on July 12, 2024, Bloomberg published an article, reporting that the Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI") had launched investigations into Arbor's "lending practices and the Company's claims about the performance of their loan book."

9.     On this news, the price of Arbor stock declined 17.33% in one day, from a close of

$15.53 per share on July 11, 2024 to a close of $12.89 per share on July 12, 2024.

10.     In light of the Individual Defendants' misconduct, the Company and Defendants Kaufman and Elenio were named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of New York under the caption: *Martin v. Arbor Realty Trust, Inc.*, *et al.,* Case No. 1:24-cv-05347 (E.D.N.Y.) (the "Securities Class Action.") The Securities Class Action has further subjected Arbor to the need to undertake internal investigations and the need to implement adequate internal controls, as well as exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n(a)) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9).

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Nominal Defendant Arbor is headquartered in this District and conducts substantial business in this District. Further, a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District.

Additionally, Arbor's common stock trades on the New York Stock Exchange ("NYSE"), which is headquartered in New York.

## PARTIES

16.     Plaintiff is a current shareholder of Arbor. Plaintiff has continuously held Arbor common stock at all relevant times.

17.     Nominal Defendant Arbor is incorporated under the laws of Delaware with its principal executive offices located at 333 Earle Ovington Boulevard, Suite 900, Uniondale, New York. Arbor's Class A common stock trades on the New NYSE under the symbol "ABR."

18.     Defendant Kaufman has served as the Company's Chairman of the Board, Chief Executive Officer ("CEO"), and President since 2003. According to the Company's public filings, in 2024, Defendant Kaufman received $12,057,878 in total compensation from the Company. Defendant Hyman is a defendant in the Securities Class Action.

19.     Defendant Elenio has served as the Company's Chief Financial Officer ("CFO") since 2005. According to the Company's public filings, in 2024, Defendant Elenio received $2,510,927 in total compensation from the Company. Defendant Elenio is a defendant in the Securities Class Action.

20.     Defendant Bacon has served as a Company director since 2020. Defendant Bacon serves as a member of the Board's Audit Committee and Corporate Governance Committee. According to the Company's public filings, in 2024, Defendant Bacon received $236,301 in total compensation from the Company.

21.     Defendant Effron has served as a Company director since 2021. Defendant Effron serves as a member of the Board's Audit Committee and Corporate Governance Committee. According to the Company's public filings, in 2024, Defendant Effron received $236,301 in total

compensation from the Company.

22. Defendant Farrell has served as a Company director since 2018. Defendant Farrell serves as a member of the Board's Audit Committee and Compensation Committee. According to the Company's public filings, in 2024, Defendant Farrell received $236,301 in total compensation from the Company.

23. Defendant Green has served as a Company director since 2012. Defendant Green serves as a member of the Board's Audit Committee and as Chair of the Compensation Committee. According to the Company's public filings, in 2024, Defendant Green received $291,301 in total compensation from the Company.

24. Defendant Lazar has served as a Company director since 2003. Defendant Lazar serves as the Chair of the Board's Audit Committee and as a member of the Compensation Committee. According to the Company's public filings, in 2024, Defendant Lazar received $251,301 in total compensation from the Company.

25. Defendant Martello has served as a Company director since 2003. According to the Company's public filings, in 2024, Defendant Martello received $217,500 in total compensation from the Company.

26. Defendant Schwartz has served as a Company director since 2018. Defendant Schwartz serves as the Chair of the Board's Corporate Governance Committee and as a member of the Compensation Committee. According to the Company's public filings, in 2024, Defendant Schwartz received $246,301 in total compensation from the Company.

27. Non-Party George Tsunis served as a Company director from 2016 until 2022 and was reappointed to the Board in March 2025. Tsunis is named herein solely for the purposes of demand futility.

28.    Non-Party Carrie Wilkens served as a Company director since October 2023. According to the Company's public filings, in 2024, Defendant Wilkens received $236,301 in total compensation from the Company. Wilkens is named herein solely for the purposes of demand futility.

## SUBSTANTIVE ALLEGATIONS

29.    Arbor is a real estate investment trust that provides loan origination and servicing for multi-family, commercial, and healthcare properties. The Company's operations are divided into its two business segments: (1) its Agency Business and (2) its Structured Business.

30.    Through its Agency Business, the Company originates, sells and services a range of multifamily finance products through the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," and together with Fannie Mae, the government-sponsored enterprises, or "GSEs"), the Government National Mortgage Association ("Ginnie Mae"), Federal Housing Authority ("FHA") and the U.S. Department of Housing and Urban Development (together with Ginnie Mae and FHA, "HUD").

31.    In order to maintain its status as an approved lender for Fannie Mae and Freddie Mac and as an issuer of Ginnie Mae securities, Arbor must operate in accordance with the applicable guidelines and requirements established by these agencies.

32.    Through the Company's Agency Business, Arbor additionally originates permanent financing loans, referred to as "Private Label" loans, which Arbor describes in its public filings as "underwritten using the guidelines of our existing agency loans sold to the GSEs."

33.    In recent years, the Company has reported explosive growth and record profitability, despite industry-wide challenges that have plagued other REITs, including high interest rates and a recessionary environment. Arbor has primarily attributed its success to its

ability to attract money by offering Collateralized Loan Obligations and then using that money to create a portfolio of bridge loans.

34.    Bridge loans are typically short-term loans, with a maturity date of one to three years from their origination date, and they carry a variable interest rate, meaning the interest rate can change over the duration of the loan. Bridge loans are transitional loans, ideal for non-stabilized property, as they allow the borrower time to stabilize the property before refinancing into a long-term, fixed-rate loan. In the context of multifamily properties, a stabilized property is one that has a steady occupancy rate and receives predictable cash flow.

35.    Throughout the Relevant Period, the Company represented that its "[b]orrowers typically use the proceeds of a conventional mortgage, such as our GSE/agency loans, to repay a bridge loan," also referred to as a takeout loan. A takeout loan involves using a loan that is procured later to replace the initial loan. Arbor has also stated in its public filings that its loans held-for-investment, through its Structured Business, are intended to be held-to-maturity and, as a result, are carried at cost, net of unamortized loan origination costs and fees, loan purchase discounts, and net of the allowance for credit losses.

36.    While Arbor's Agency Business segment primarily generates revenue through gains and fees recognized from the origination and sale of mortgage loans, the Structured Business generates revenue based on interest margin on loans held, which refers to the yield on investments less cost to finance investments.

37.    Throughout the Relevant Period, the Company's growth strategy involved originating bridge loans to borrowers at the acquisition or renovation stage of an underlying asset, and then, once the bridge loan matured or the property stabilized, originating and servicing a long-term Agency loan, thereby providing the Company with two sources of revenue from the same

deal. Indeed, with respect to the Company's "Investment Strategy," Arbor stated the following in

its public filings:

> We believe that providing both structured products and GSE/agency loans through
> direct originations and in-house underwriting capabilities throughout our national
> network of sales offices and lending solutions through various GSE and HUD
> programs provides us with a competitive advantage, since this allows us to meet
> the multiple needs of borrowers through fully integrated, comprehensive product
> offerings.

38.    Arbor further purports to employ the following strategies to achieve its stated

business objectives:

- ***Provide Customized Financing***. We provide a suite of comprehensive
customized financing solutions to meet the various needs of borrowers. We target
borrowers whose options may be limited by conventional bank financing, have
demonstrated a history of enhancing the value of the properties they operate and
who may benefit from the customized financing solutions we offer.

- ***Execute Transactions Rapidly***. We act quickly and decisively on proposals,
provide commitments and close transactions within a few weeks and sometimes
days, if required. We believe that our rapid execution attracts opportunities from
both borrowers and other lenders that would not otherwise be available and that our
ability to structure flexible terms and close loans quickly gives us a competitive
advantage.

- ***Manage Credit Quality***. A critical component of our strategy is our ability
to manage the real estate risks associated with our investment portfolio. We actively
manage the credit quality of our portfolio by using the expertise of our asset
management group, which has a proven track record of structuring and repositioning
investments to improve credit quality and yield.

- ***Use Our Relationships with Existing Borrowers***. We have solid
relationships with a large nationwide borrower base and maintain a strong
reputation in the commercial real estate finance industry. Through the expertise
of our originators, we offer a wide range of customized financing solutions and
benefit from our existing customer base by using existing business to create
potential refinancing opportunities.

- ***Long-Established Relationships with GSEs***. Our Agency Business benefits
from our long-established relationships with Fannie Mae, Freddie Mac and HUD
enabling us to offer a broad range of loan products and services which maximizes
our ability to meet borrowers' needs.

- ***Leverage the Experience of Executive Officers and Our Employees***. Our
executive officers and employees have extensive experience originating and

managing structured commercial real estate investments. Our senior management team has, on average, over 30 years of experience in the financial services industry.

39.    Throughout the Relevant Period, the Company assured the public that it adhered to a comprehensive set of underwriting standards. For example, Arbor stated in its 2021 annual report, filed on February 18, 2022 on Form 10-K with the SEC that its underwriters "perform due diligence on all proposed transactions prior to approval and commitment using several tools to manage and mitigate potential loan losses and risk sharing exposure." Arbor further identified as "[k]ey factors" considered in its credit decisions "debt service coverage, loan-to-value ratios and property financial and operating performance."

40.    The debt service coverage ratio ("DSCR") is a measure of the cash flow available to pay debt obligations and is calculated by dividing a property's annual net operating income by its annual debt service payments. A loan-to-value ratio ("LTV") is calculated by dividing the loan balance by the value of the property. A high LTV typically indicates that the loan is risky.

***Arbor Disregards its Own Underwriting Standards to Increase its Volume of Originated Loans***

41.    Beginning in late 2020, the multi-family real estate market became inundated inexperienced real estate syndicators, seeking to capitalize on rising rents and low interest rates during the COVID-19 pandemic. Syndicators refer to individuals that pool funds from multiple small-time investors to buy properties.

42.    Due to the foregoing, the Company's Structured Business emerged as one of the largest sub-prime lenders in the country. Indeed, Arbors' Structured business grew 122% in 2021 to $12.6 billion on loan originations totaling $9.72 billion, up from $2.43 billion in 2020, and multi-family bridge loans constituted 95% of the $9.72 billion Structured loans originated in 2021.

43.    This growth continued into 2022, with the Company's Structured Business growing

another 19% to $14.46 billion on loan originations totaling $6.15 billion. Multi-family bridge loans constituted 94% of the $6.15 billion Structured loans originated in 2022. As of December 31, 2022, 98% of ABR's Structured portfolio consisted of housing-related bridge loans, 91% of which were multifamily commercial real estate assets.

44.     Despite this inundation of inexperienced, and inherently risky, real estate syndicators into the multi-family asset market, the Individual Defendants assured the public that Arbor was maintaining conservative underwriting standards when originating this influx of multifamily bridge loans on its balance sheet portfolio. Contrary to these assurances, several former employees confirm that the Company failed to maintain adequate underwriting standards, and the Individual Defendants caused Arbor's employees to disregard the Company's own stated guidelines to increase the volume of loans it originated.

45.     For example, FE 2 characterized Arbor as a "volume shop" and as a factory pumping out bridge loans, and she explained that the Company's underwriting practices were inadequate to truly evaluate projects and owners receiving the loans. FE 2 stated that Arbor hired underwriters with no experience on bridge loans and that essentially every loan got approved. FE 2 explained that, although she was an agency underwriter and lacked experience with bridge loans, the Company pulled FE 2 into performing underwriting for these bridge loans. According to FE 2, Defendant Kaufman personally authorized each bridge loan that she completed. FE 2 recalled receiving confirmation emails informing her that loans were approved and that Defendant Kaufman had sent and received emails on the same email chains. FE 2 explained that Kaufman would often approve bridge loans within a minute of receiving the proposed deal.

46.     FE 5 similarly recalled Arbor signing deals at extremely high volumes at the expense of quality. FE 5 explained that closing loans was the top priority at the Company and no

one really asked questions, describing it as a "whatever-it-takes mindset." FE 1 recalled "working 24-7" in the summer of 2022, due to the influx in loan volume.

47.    FE 7 recalled observing "weird assets" from syndicator borrowers and questioning how certain properties would be able to pay their debt obligations. FE 7 recalled Arbor's underwriting analysts joking with one another by saying, "I can't believe this guy is going to buy this trash." In many instances, Arbor still approved the loans.

48.    According to FE 4, there was little oversight on the credit side, and Arbor provided broad and unreliable guidelines. Likewise, FE 8 characterized the Company underwriting guidelines as "underwriting without support." FE 8 further recalled underwriters utilizing baseline standards for its credit analyses, regardless of the specific market.

49.    FE 6 explained that Arbor's underwriters failed to perform stress testing on its bridge loans, which involves evaluating a borrower's ability to repay its debt obligations in the event of adverse economic conditions like rising interest rates, declining property values, or reduced income for borrowers.

50.    FE 3 referred to the underwriting process on bridge loans as "shoddy," and explained that the general sentiment amongst the Company's asset management team was that many deals were risky and aggressively underwritten.

51.    Rate caps refer to a type of insurance that protects borrowers from unexpected interest rate increases, and lenders typically require borrowers to purchase such insurance prior to closing on a variable-rate loan. The buyer of the rate cap receives payments if the interest rate rises above a specified amount. FE 6 reported that, starting around mid-to late-2021, Arbor stopped requiring rate caps for "stronger performing deals." FE 7 similarly recalled that, by early-2022, Arbor stopped requiring rate caps on any bridge loans.

52.    Numerous former employees confirmed that the Individual Defendants falsified and/or manipulated property appraisals to create the illusion that they complied with Arbor's underwriting standards, resulting in in unreasonably high property valuations and purchase prices. As a result, the Company's LTV ratios were materially understated, allowing the Individual Defendants to understate the level of risk associated with its loans.

53.    Exacerbating the issues related to the Company's inadequate underwriting practices, rising interest rates toward the end of 2022 increased the cost of the Company's variable-rate bridge loans issued to inexperienced, overleveraged real estate syndicators on non-stabilized multi-family properties. As a result, the likelihood that property stabilization would be adequate to meet agency standards diminished, and borrowers struggled to make payments, increasing the Company's risk of loss.

54.    Further, despite material deficiencies with the Company's internal controls regarding its risk rating system and LTV ratios, the Individual Defendants continued to employ these ineffective internal controls to conceal the issues related to the Company's risky bridge loans.

55.    Additionally, as the Individual Defendants caused Arbor's employees to disregard the Company's stated underwriting guidelines when originating high-risk bridge loans to individuals and entities highly likely to default, the Company was obligated to substantially increase its CECL allowance. By understating its CECL in violation of GAAP, the Individual Defendants reported inflated net income throughout the Relevant Period.

***False and Misleading Statements***

56.    Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Arbor failed to maintain

adequate underwriting standards and disregarded its own stated guidelines; (ii) as a result, the Company originated a high volume of multifamily bridge loans that were at a heightened risk of default; (iii) in violation of GAAP, the Individual Defendants failed to record adequate CECL to account for the Company's deviations from its underwriting standards; (iv) as a result, Arbor's reported net income was materially overstated throughout the Relevant Period; (v) the Individual Defendants falsified and/or manipulated property appraisals to conceal the Company's divergence from its underwriting standards; (vi) the Company's LTV ratios were materially understated; (vii) Arbor lacked adequate internal controls related to its risk rating system and LTV ratios; and (viii) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

57. On May 7, 2021, the Company filed a quarterly report on Form 10-Q with the SEC for the first fiscal quarter of 2021 (the "1Q21 10-Q"), which reported $81.1 million in quarterly net income, compared to a net loss of $68.4 million during the same period of the prior year. The 1Q21 10-Q further reported net income attributable to common stockholders of $69.5 million, or $0.55 per diluted common share, compared to a net loss of $59.3 million, or $0.54 per diluted common share during the same period of the prior year.

58. With respect to the Company's "provision for credit losses (net of recoveries)," Arbor reported a reversal of $1.08 million. With respect to the Company's "Allowance for Credit Losses," Arbor provided the following "summary of the changes in the allowance for credit losses . . . (in thousands)":

| | Land | Multifamily | Retail | Office | Hotel | Healthcare | Student Housing | Other | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Three Months Ended March 31, 2021 | | | | | |
| Allowance for credit losses: | | | | | | | | | |
| Beginning balance | $ 78,150 | $ 36,468 | $ 13,861 | $ 1,846 | $ 7,759 | $ 3,880 | $ 4,078 | $ 2,287 | $ 148,329 |
| Provision for credit losses (net of recoveries) | (54) | (6,439) | (13) | 6,205 | (5) | (8) | (580) | (135) | (1,029) |
| Ending balance | $ 78,096 | $ 30,029 | $ 13,848 | $ 8,051 | $ 7,754 | $ 3,872 | $ 3,498 | $ 2,152 | $ 147,300 |

59.     The 1Q21 10-Q further reported that Arbor's distributable earnings, defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as … CECL provisions for credit losses…," was $75.1 million, or $0.52 per diluted common share, compared to $40.5 million, or $0.31 per diluted common share during the same period of the prior year.

60.     In a section titled "Concentration of Credit Risk," the 1Q21 10-Q stated, in pertinent part:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

> Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

61.     The 1Q21 10-Q further provided the following "summary of the loan portfolio's

| Asset Class / Risk Rating | UPB by Origination Year | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | 2018 | 2017 | Prior | |
| **Multifamily:** | | | | | | | |
| Pass | $ 575,864 | $ 874,039 | $ 85,964 | $ — | $ 32,500 | $ 744 | $ 1,569,111 |
| Pass/Watch | 403,657 | 773,882 | 784,425 | 138,705 | 3,500 | 28,800 | 2,132,969 |
| Special Mention | — | 369,329 | 745,731 | 94,333 | 117,758 | — | 1,327,151 |
| Substandard | — | 14,340 | 96,300 | 23,405 | 16,500 | 8,250 | 158,795 |
| Doubtful | — | — | — | — | 17,700 | — | 17,700 |
| **Total Multifamily** | $ 979,521 | $ 2,031,590 | $ 1,712,420 | $ 256,443 | $ 187,958 | $ 37,794 | $ 5,205,726 |

internal risk ratings and LTV ratios by asset class at March 31, 2021 . . . ($ in thousands)," including, *inter alia*, the "Multifamily" asset class:

62.     The 1Q21 10-Q reported that the Company's weighted average Last Dollar LTV Ratio for its total multifamily asset class was 75%.

63.     Also on May 7, 2021, Arbor issued a press release titled "Arbor Realty Trust Reports First Quarter 2021 Results and Increases Dividend for Fourth Consecutive Quarter to $0.34 per Share" (the "1Q21 Release"). The 1Q21 Release was attached as an exhibit to a current report, filed with the SEC on Form 8-K.

64.     The 1Q21 Release reported "GAAP net income of $0.55 and distributable earnings of $0.52 per diluted common share." The 1Q21 Release further stated:

> Arbor reported net income for the quarter of $69.5 million, or $0.55 per diluted common share, compared to a net loss of $59.3 million, or $0.54 per diluted common share for the quarter ended March 31, 2020. Distributable earnings for the quarter was $75.1 million, or $0.52 per diluted common share, compared to $40.5 million, or $0.31 per diluted common share for the quarter ended March 31, 2020.

65.     The 1Q21 Release additionally reported:

> During the first quarter of 2021, *the Company recorded a $1.02 million reversal of provisions for loan losses associated with CECL*. At March 31, 2021, *the Company's total allowance for loan losses was $147.3 million*. The Company had seven non-performing loans with a carrying value of $60.3 million, before related loan loss reserves of $6.5 million as of March 31, 2021 and December 31, 2020.[2]

66.     During a related earnings call, hosted by Arbor on the same day (the "1Q21 Earnings Call"), Defendant Elenio opened by touting "another exceptional quarter, producing distributable earnings of $75 million or $0.52 per share for the first quarter." Defendant Elenio continued, stating that Arbor's "adjusted book value at March 31 was approximately $10.86 a share, adding back roughly $62 million of noncash general CECL reserves on a tax-affected basis. This is up 5% from approximately $10.35 a share last quarter, largely due to our first quarter capital

raise as well as the significant earnings we generated in the first quarter that were well in excess of our dividend."

67.    During the 1Q21 Earnings Call, Defendant Kaufman highlighted the "credit quality of [Arbor's] portfolio," stating:

> **We produced distributable earnings of $0.52 per share**, which is an incredible accomplishment and well in excess of our current dividend, representing a payout ratio of just around 65%.
>
> Our ability to consistently generate exceptional results and increase our dividend is a true testament to the value of our franchise and the many diversified income streams we have created. **We continue to realize significant benefits from many areas of our diverse platform, including** continued growth in our GSE agency platform that produces strong margins and increased servicing fees, strong contributions from our private label program, record growth and significant benefits from the size and scale of our balance sheet business as well as **superior execution in our liability structures**. Strong performance of our multifamily focused portfolios with very few delinquencies and extremely low forbearances and substantial income from our residential business. **And these reoccurring benefits**, combined with our versatile originations platform, strong pipeline **and credit quality of our portfolio puts us in a unique position to be able to continue to produce significant distributable earnings going forward as we are extremely well positioned for future growth and success.**

68.    Defendant Kaufman further claimed during the 1Q21 Earnings Call that "one of key business strategies is the financing of our **high-quality balance sheet portfolio**" and stated that the Company's "**balance sheet loans also create a substantial pipeline of future GSE agency origination volumes and long-dated servicing revenues, further increasing our future earnings and dividends**."

69.    Later during the 1Q21 Earnings Call, Charles Douglas Arestia, an analyst from JP Morgan Chase & Co ("JP Morgan"), asked Defendant Kaufman the following question:

> We've heard a lot recently about there being a lot of capital chasing after multifamily and industrial properties lately, sort of a flight to quality post COVID, broader unknowns around office and hospitality and more of the known issues with retail. Obviously, multifamily is most relevant to Arbor by a wide margin. But Ivan, would love to get your view on what you're seeing out there in terms of competition

for your core assets. If you're seeing that competition pick up recently as more of your peers have gotten more comfortable deploying capital than maybe a quarter or 2 ago.

70.    In response, Defendant Kaufman stated the following:

The competition is fierce. I mean it's actually greater now than it was pre pandemic. And even a lot of the people who got hurt are back and being very aggressive. So there's no question there's a lot of compression on our pricing, but trying to make that up on the debt side. And we do have a franchise. And so we do have a lot of momentum. We did bulk up in the fourth quarter and first quarter to kind of get ahead. So we have good spreads in place. We'll work on our liability structures and keep an eye on credit. *And I think one of the other things we're going to focus on very, very, very precisely is that for the loans we do put on our balance sheet, we're going to try and turn them as much as we can into agency and pick up the back end fees and reduce our risk on some of the loans on our books*. But make no mistake about it. It's an extraordinarily aggressive environment right now.

71.    On July 30, 2021, the Company filed a quarterly report on Form 10-Q with the SEC for the second fiscal quarter of 2021 (the "2Q21 10-Q"), which reported $84.3 million in quarterly net income, compared to a net loss of $54.1 million during the same period of the prior year. The 2Q21 10-Q further reported net income attributable to common stockholders of $69.1 million, or $0.51 per diluted common share, compared to a net income of $44.1 million, or $0.40 per diluted common share during the same period of the prior year.

72.    With respect to the Company's "provision for credit losses (net of recoveries)," Arbor reported a reversal of $7.8 million. With respect to the Company's "Allowance for Credit Losses," Arbor provided the following "summary of the changes in the allowance for credit losses . . . (in thousands)":

| | Land | | Multifamily | | Retail | | Office | | Healthcare | | Three Months Ended June 30, 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Allowance for credit losses: | | | | | | | | | | | |
| Beginning balance | $ | 78,096 | $ | 30,029 | $ | 13,848 | $ | 8,051 | $ | 3,872 | $ |
| Provision for credit losses (net of recoveries) | | (39) | | 131 | | (29) | | (229) | | (6) | |
| Ending balance | $ | 78,057 | $ | 30,160 | $ | 13,819 | $ | 7,822 | $ | 3,866 | $ |

73.    The 2Q21 10-Q further reported $68.8 million in distributable earnings, or $0.45

18

per diluted common share, compared to $59.8 million, or $0.45 per diluted common share during the same period of the prior year.

74.     In a section titled "Concentration of Credit Risk," the 2Q21 10-Q stated, in pertinent part:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.
>
> Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

75.     The 2Q21 10-Q further provided the following "summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at June 30, 2021 . . . ($ in thousands)," including, *inter alia*, the "Multifamily" asset class:

| Asset Class / Risk Rating | UPB by Origination Year | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2019 | 2018 | 2017 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $  1,852,008 | $  753,955 | $  44,035 | $  — | $  — | $  335 | $  2,650,333 |
| Pass/Watch | 699,139 | 817,032 | 468,975 | 121,555 | 36,000 | 29,150 | 2,171,851 |
| Special Mention | 50,537 | 415,935 | 697,673 | 111,483 | 98,138 | — | 1,373,766 |
| Substandard | — | 18,840 | 120,530 | 16,925 | 16,500 | 8,250 | 181,045 |
| Doubtful | — | — | — | — | 17,700 | — | 17,700 |
| Total Multifamily | $  2,601,684 | $  2,005,762 | $  1,331,213 | $  249,963 | $  168,338 | $  37,735 | $  6,394,695 |

76.     The 2Q21 10-Q reported that the Company's weighted average Last Dollar LTV

Ratio for its total multifamily asset class was 76%.

77.     Also on July 30, 2021, Arbor issued a press release titled "Arbor Realty Trust Reports Second Quarter 2021 Results and Increases Quarterly Dividend to $0.35 per Share" (the "2Q21 Release"). The 2Q21 Release was attached as an exhibit to a current report, filed with the SEC on Form 8-K.

78.     The 2Q21 Release reported "GAAP net income of $0.55 and distributable earnings of $0.52 per diluted common share." The 2Q21 Release further stated:

> Arbor reported net income for the quarter of $69.1 million, or $0.51 per diluted common share, compared to net income of $44.1 million, or $0.40 per diluted common share for the quarter ended June 30, 2020. Distributable earnings for the quarter was $68.8 million, or $0.45 per diluted common share, compared to $59.8 million, or $0.45 per diluted common share for the quarter ended June 30, 2020.

79.     The 2Q21 Release additionally reported:

> During the second quarter of 2021, the Company *recorded an $8.3 million reversal of provisions for loan losses associated with CECL*, which includes a $7.5 million loan loss recovery. At June 30, 2021, the Company's *total allowance for loan losses was $138.4 million*. The Company had eight non-performing loans with a carrying value of $84.0 million, before related loan loss reserves of $6.5 million, compared to seven loans with a carrying value of $60.3 million, before related loan loss reserves of $6.5 million as of March 31, 2021.

80.     During a related earnings call, hosted by Arbor on the same day (the "2Q21 Earnings Call"), Defendant Kaufman stated the following with respect to the Company's recent capital activity:

> *Every time we raise capital is to fund our growing balance sheet loan business*, which is not only high accretive to our current earnings and dividends, but also *allows us to build a pipeline for 2 to 3 years of new GSE agency loans*, showing the long-term growth of our platform and creating higher quality earnings and dividends in the future.

81.     During the 2Q21 Earnings Call, Defendant Kaufman highlighted Arbor's recent CLO activity, stating that Arbor has "consistently been a leader in the CLO securitization market

as financing a ***high-quality balance sheet portfolio*** with the appropriate liability structures continues to be one of our key business strategies."

82.    Also during the 2Q21 Earnings Call, Defendant Kaufman stated the following with respect to Arbor's second quarter financial performance:

> [O]ur quarterly financial results were once again truly remarkable. ***We produced distributable earnings of $0.45 per share, which is incredible accomplishment and well in excess of our current dividend, representing a payout ratio of around 78%.*** Our ability to consistently generate exceptional results and increase our dividend is a true testament to the value of our franchise and the many diverse income streams we have created.
>
> We continue to realize significant benefits from many areas of our diverse operating platform, continued growth in our GSE agency platform which produces strong margins and increased servicing fees, significant contributions from our private label program, record growth and significant benefits from the size and scale of our balance sheet business as well ***as superior execution on our liability structures***, strong performance of our multifamily-focused portfolio with very few delinquencies and substantial income from our residential businesses. And these reoccurring benefits, combined with our versatile originations platform, strong pipeline and ***credit quality of our portfolio puts us in a unique position to be able to continue to produce significant distributable earnings going forward as we're extremely well-positioned for future growth and success.***

83.    Defendant Kaufman further highlighted that "***these balance sheet loans also create substantial pipeline of future GSE agency loan origination volumes and long-dated servicing revenues***, further increasing our future earnings and dividends."

84.    Later during the 2Q21 Earnings Call, Defendant Elenio reported that:

> [W]e had another exceptional quarter, producing distributable earnings of $69 million or $0.45 per share. These results once again translated into industry high ROEs of approximately 17% for the quarter and allowed us to increase our dividend to an annual run rate of $1.40 a share. And this quarterly dividend increase reflects our fifth consecutive quarterly increase and our 21st increase in the last 10 years.

85.    Defendant Elenio further touted Arbor's "adjusted book value at June 30 was approximately $11.35, adding back roughly $61 million of noncash general CECL reserves on a tax-effected basis."

86.     On October 29, 2021, the Company filed a quarterly report on Form 10-Q with the SEC for the third fiscal quarter of 2021 (the "3Q21 10-Q"), which reported $86.1 million in quarterly net income, compared to a net loss of $97.7 million during the same period of the prior year. The 3Q21 10-Q further reported net income attributable to common stockholders of $72.8 million, or $0.51 per diluted common share, compared to a net income of $82 million, or $0.72 per diluted common share during the same period of the prior year.

87.     With respect to the Company's "provision for credit losses (net of recoveries)," Arbor reported a reversal of $3.9 million. With respect to the Company's "Allowance for Credit Losses," Arbor provided the following "summary of the changes in the allowance for credit losses . . . (in thousands)":

| | | | Three Months Ended September 30, 2021 | | |
| | Land | Multifamily | Retail | Office | Student Housing | |
|---|---|---|---|---|---|---|
| Allowance for credit losses: | | | | | | |
| Beginning balance | $ 78,057 | $ 30,160 | $ 13,819 | $ 7,822 | $ 2,365 | $ |
| Provision for credit losses (net of recoveries) | (45) | (2,093) | — | (95) | (542) | |
| Ending balance | $ 78,012 | $ 28,067 | $ 13,819 | $ 7,727 | $ 1,823 | $ |

88.     The 3Q21 10-Q further reported $75.7 million in distributable earnings, or $0.47 per diluted common share, compared to $67.1 million, or $0.50 per diluted common share during the same period of the prior year.

89.     In a section titled "Concentration of Credit Risk," the 3Q21 10-Q stated, in pertinent part:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio

assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

90.    The 3Q21 10-Q further provided the following "summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at September 30, 2021 . . . ($ in thousands)," including, *inter alia*, the "Multifamily" asset class:

| Asset Class / Risk Rating | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | 2018 | 2017 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $ 3,167,965 | $ 350,623 | $ 185,265 | $ — | $ 20,300 | $ 276 | $ 3,724,429 |
| Pass/Watch | 1,458,271 | 1,077,411 | 256,877 | 127,255 | 32,500 | 28,800 | 2,981,114 |
| Special Mention | 180,723 | 415,519 | 617,506 | 63,233 | | 350 | 1,277,331 |
| Substandard | — | 14,340 | 89,330 | 11,400 | 31,117 | 8,250 | 154,437 |
| Doubtful | — | — | — | — | 17,700 | | 17,700 |
| Total Multifamily | $ 4,806,959 | $ 1,857,893 | $ 1,148,978 | $ 201,888 | $ 101,617 | $ 37,676 | $ 8,155,011 |

91.    The 3Q21 10-Q reported that the Company's weighted average Last Dollar LTV Ratio for its total multifamily asset class was 76%.

92.    Also on October 29, 2021, Arbor issued a press release titled "Arbor Realty Trust Reports Third Quarter 2021 Results and Increases Quarterly Dividend to $0.36 per Share" (the "3Q21 Release"). The 3Q21 Release was attached as an exhibit to a current report, filed with the SEC on Form 8-K.

93.    The 3Q21 Release reported "GAAP net income of $0.51 and distributable earnings of $0.47 per diluted common share." The 3Q21 Release further stated:

Arbor reported net income for the quarter of $72.8 million, or $0.51 per diluted

common share, compared to net income of $82.0 million, or $0.72 per diluted common share for the quarter ended September 30, 2020. Distributable earnings for the quarter was $75.7 million, or $0.47 per diluted common share, compared to $67.1 million, or $0.50 per diluted common share for the quarter ended September 30, 2020.

94.     The 3Q21 Release additionally reported:

During the third quarter of 2021, the Company *recorded a $4.1 million reversal of provisions for loan losses associated with CECL*, which includes a $1.1 million loan loss recovery. At September 30, 2021, *the Company's total allowance for loan losses was $131.5 million*. The Company had six non-performing loans with a carrying value of $55.6 million, before related loan loss reserves of $2.6 million, compared to eight loans with a carrying value of $84.0 million, before related loan loss reserves of $6.5 million as of June 30, 2021.

95.     During a related earnings call, hosted by Arbor on the same day (the "3Q21 Earnings Call"), Defendant Kaufman opened by explaining the following about the Company's purported business model:

It is very important for us to continue to emphasize the value of having multiple products with diverse income streams which has allowed us to consistently grow our earnings and dividends while maintaining a very low dividend payout ratio. We've strategically built an annuity-based business model of creating multiple income streams from a single investment. As a result, not only did we generate strong risk-adjusted returns on our capital, which positively affect our current earnings, more importantly, *we are also building a much higher-quality future earnings and dividend growth story by ensuring that our assets will provide us with multiple other products in the future*. And this is one of the major differentiators of our business platform, which is why we strongly believe we should consistently trade at a substantial premium and much lower dividend yield than anyone else in our peer group.

96.     During the 3Q21 Earnings Call, Defendant Kaufman stated the following with respect to the Company's recent capital activity:

*Every time we raise capital to fund our growing balance sheet loan business*, which is not only accretive to our current earnings and dividends, but also *allows us to build a pipeline for 2 to 3 years of new GSE agency and private label loans that produce additional long-term-dated income streams*, ensuring the growth of our platform and creating high-quality earnings and dividends for the future.

97.     With respect to Arbor's recent CLO activity, Defendant Kaufman stated that the

Company has "consistently been a leader in the CLO securitization market. It's financing our ***high-quality balance sheet portfolio*** with the appropriate liability structures continuing to be one of the key business strategies"

98.    Also during the 3Q21 Earnings Call, Defendant Kaufman stated the following with respect to Arbor's third quarter financial performance:

> Turning now to our third quarter performance, as Paul will discuss in more detail, our quarterly financial results were once again remarkable. We produced distributable earnings of $0.49 per share, which is well in excess of our current dividend, representing a payout ratio of around 75%.
>
> * * *
>
> And again, I want to emphasize the significant value of our balance sheet business, which not only generates strong levered returns on our capital, but very importantly, these investments also provide us the future agency and private-label transactions with long-dated income streams.
>
> * * *
>
> In summary, we had another exceptional quarter and are well positioned to close out 2021 as another record year. We have developed a unique, multi-tiered, annuity-based operating platform that provides us with future annuity of high-quality, long-dated income streams, making us confident in our ability to continue to grow our earnings and dividends and significantly outperform our peers.

99.    Later during the 3Q21 Earnings Call, Defendant Elenio reported that:

> [W]e had another exceptional quarter, producing distributable earnings of $76 million or $0.47 per share and $0.49 per share, excluding a onetime realized loss of $2.8 million on a non-multifamily asset that we had taken a reserve on early last year as a result of the pandemic. These quarterly results once again translated into industry high ROEs of approximately 17% and have allowed us to increase our dividend to an annual run rate of $1.44 a share, and this dividend increase reflects our sixth consecutive quarterly increase and our 22nd increase in the last 10 years.

100.    Defendant Elenio highlighted that "***the credit quality of our portfolio has been outstanding*** as we have very little exposure to the asset classes that have been affected the most by the recession, and we also believe we have adequately reserved against those positions."

101.    During the 3Q21 Earnings Call, Richard Barry Shane, an analyst from JP Morgan,

asked Defendant Kaufman the following question:

> Look, I'd like to talk a little bit about the Agency Business and how we should think
> about the difference between the pipeline on the Fannie, Freddie paper and the
> private label. I'm curious if there are differences in terms of accumulation periods
> for each, what the hold times look like, and more importantly, how we should think
> about hedging and revenue recognition. Is there anything in terms of pipeline
> hedging with rates moving around we should be aware of?

102.    In response, Defendant Kaufman stated:

> Our bridge pipeline is as strong as ever, and we're actually quoting right now to
> close bridge loans, which used to be done within 45 days, we'll call it, in 75 to 90,
> just the backup in the industry on third parties and our own processing systems.
> The demand for bridge product is extremely strong. I think what we're seeing in
> the market are people are buying a lot of product today, and they're seeing that new
> rents are 5% to 10% above old rents, so they want to bridge the product for 12
> months, get full unit terms and then do a permanent takeout. So that philosophy fits
> in very well with our business model. This **will do the bridge loan, get great risk
> adjustment returns and then turn it into an agency loan and then once again get
> additional gain on sale and get long-term bridge loans** and have proprietary deal
> flow.
>
> **So that has worked extremely well for our business model, and we see that to be** very,
> **very strong all the way through the end of the year**. And we've already
> **booked -- booking most of our closings for January and February, believe it or
> not. So that's our overall outlook.**
>
> In terms of our floating rate book, we, in the past 6 to 9 months, have been very
> liberal in terms of people buying caps. **As of last week, we've made it mandatory
> for people to buy caps.** I have a little concern that rates may rise. And in fact, we
> have the rights under our documents to require people to buy caps.
>
> **For loans in our portfolio, where I'll go through our portfolio now and having
> people buy rate caps**, I have a little bit of concern that there'll be a little bit of a rise
> in rates, and we want to protect ourselves against that. So that's our overall
> philosophy.

103.    The statements identified above regarding Arbor's rate cap requirements were false.

As reported by FEs 6 and 7, Arbor stopped requiring rate caps for "stronger performing deals"

around mid- to late-2021, and, by early-2022, the Company stopped requiring rate caps on any

bridge loans.

104.    Also during the 3Q21 10-Q, in response to a question regarding whether the Individual Defendants had "any concerns about underwriting standards and competitive pressures in the market," Defendant Kaufman stated:

> We've definitely a lot of competitors, and there's a lot of business out there. I do always have concerns when there's a lot of competition. We have a great reputation in the market. We pick our spots. We know where to put our dollars. We believe that in all competitive markets, there are a lot of mistakes that are always going to be made. And we just have to proceed very prudently. ***We've put a huge focus on lending on cash flow deals, deals that have positive coverage that need very little heavy lift***. That's very different than what happened 4 or 5 years ago when there were a lot of B and C assets being bought with tremendous amount of lift. ***The lift is very small. It's basically unit terms.***
>
> Our biggest concern right now is the market turned into a syndicator market, where you have a lot of syndicators coming in with very little net worth and liquidity raising money and don't have the liquidity to withstand a -- withstand any bumps in the road. ***So we're very careful of who we're dealing with***. Usually where speed bumps is with multiple assets. And we want to make sure the structure between the GP and the LPs are good. I think that's where a lot of mistakes are being made right now. They're working with thinly capitalized sponsors. They're working with people who they're trying to win a deal for 5 basis points with no structure. ***We're maintaining our structure on our deals***. Other people are not. So I think we have a lot of experience in the way we run our business, and we're able to be a little more selective than most.

105.    When probed further regarding "the conversion rate historically of the multifamily bridge loans into the agency product," Defendant Elenio responded:

> Sure. So I think you got to look at it a couple of ways, right? So we've historically targeted anywhere to 40% to 60%, sometimes higher, of recapture rate on our bridge loans. Certainly, when there's sales involved, which there have been some lately, you don't always recapture that business because you don't always have that ability. But anything that's not sold that comes up for refinance or takeout, our recapture rate is very, very high, probably in the 70% to 80% range on anything that's not sold. With stuff being sold, it's probably in the 40% to 50% range overall. But that's our target.
>
> And as Ivan mentioned, we're putting a lot of bridge loans right now. And ***with the increase in values and when rents roll, we're really sizing up a lot of these deals to come to agency. That's our model. So we think that recapture rate will be very***

***high on the business we've been putting on****. Ivan, would you agree with that?*

106.   Defendant Kaufman added:

***Yes. I think you have to look at the product we're putting on. Most of the products*** **we're putting on is requiring a turn of rents, very little CapEx. And the business model for the person buying it is to put on a bridge loan, make those terms and then turn it to an agency.**
Historically, most of the loans were heavy-lift loans, 20%, 30%, 40% CapEx, huge repositioning and usually a 2-, 3-year gestation period. And what happened with a lot of those loans, the gains were so huge with the market changes that a lot of people chose to sell those assets.

***So we think the recapture rate is going to be higher because the intended business purpose was specifically for a shorter-term bridge loan with a quick turn into agency or FHA****. And we do think our FHA platform is going to be a huge beneficiary of our bridge loans. Because as they're doing it, they'll file with the FHA, which takes 9 months to a year, and they'll run that process simultaneously. So we're pretty optimistic and hopeful that, that will really feed into our platform.*

107.   In response to a question regarding risks to the Company's growth and profitability posed by rising interest rates, Defendant Kaufman stated:

Listen, we -- I believe a little differently than most. I believe that rates are going to rise different than most people. I think that we are underwriting and positioning our business to rise in the 10-year to about 2.50%. That's what I'm thinking in the way I'm running our business. ***So we'll make sure that we have appropriate asset management skills, underwrite our loans accordingly and know how they exit and know how to manage that business****. We're also underwriting LIBOR to probably rise to 50 to 75. That's just our outlook. So we can handle that rise in interest rates and manage our business accordingly and make sure we have ample liquidity to manage the growth in our business.

108.   On February 18, 2022, the Company filed its 2021 annual report on Form 10-K with the SEC (the "2021 10-K"), which was signed by Defendants Kaufman, Elenio, Bacon, Effron, Farrell, Green, Lazar, Martello, and Schwartz. The 2021 10-K reported $377.8 million in net income for the year, up from $196.2 million during the prior year. The 2021 10-K further reported net income attributable to attributable to common stockholders of $317.4 million, compared to a net income of $163.4 million during the prior year. The 2021 10-K additionally

reported a provision reversal of $21.1 million for loan losses associated with CECL, compared to a provision of $61.1 million the prior year.

109.    In discussing the Company's "Other Expenses," the 2021 10-K stated that "[t]he decreases in both provision for loss sharing and provision for credit losses were primarily due to the reversal of CECL reserves in both business segments in connection with improved market conditions and expected future forecasts."

110.    With respect to the Company's "Allowance for Credit Losses," Arbor provided the following "summary of the changes in the allowance for credit losses . . . (in thousands)":

| | Land | Multifamily | Office | Retail | Student Housing | Hotel | Healthcare | Other | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Allowance for credit losses:** | | | | | | | | | |
| Beginning balance | $ 78,150 | $ 36,468 | $ 1,846 | $ 13,861 | $ 4,078 | $ 7,759 | $ 3,880 | $ 2,287 | $ 148,329 |
| Provision for credit losses (net of recoveries) | (180) | (17,761) | 6,227 | (42) | (3,442) | (7,751) | (1,099) | (267) | (24,315) |
| Charge-offs | — | — | — | (8,000) | — | — | (2,773) | — | (10,773) |
| Ending balance | $ 77,970 | $ 18,707 | $ 8,073 | $ 5,819 | $ 636 | $ — | $ 8 | $ 2,020 | $ 113,241 |

111.    The 2021 10-K further reported $313.7 million in distributable earnings, or $2.01 per diluted common share, compared to $234.9 million, or $1.75 per diluted common share during the prior year.

112.    In a section titled "Concentration of Credit Risk," the 2021 10-K stated, in pertinent part:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.
>
> Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch

and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

113.    The 2021 10-K further provided the following "summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at December 31, 2021 . . . ($ in thousands)," including, *inter alia*, the "Multifamily" asset class:

| Asset Class / Risk Rating | | | | | UPB by Origination Year | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | 2019 | | 2018 |
| Multifamily: | | | | | | | | |
| Pass | $ | 6,025,731 | $ | 562,885 | $ | 176,281 | $ | 6,305 |
| Pass/Watch | | 2,120,458 | | 587,820 | | 194,698 | | 120,950 |
| Special Mention | | 270,813 | | 321,031 | | 452,980 | | 42,500 |
| Substandard | | — | | 18,827 | | 43,575 | | 15,533 |
| Total Multifamily | $ | 8,417,002 | $ | 1,490,563 | $ | 867,534 | $ | 185,288 |

114.    The 2021 10-K reported that the Company's weighted average Last Dollar LTV Ratio for its total multifamily asset class was 76%.

115.    The 2021 10-K included the following generic and misleading risk disclosure related to the Company's "Financing and Hedging Activities":

***Risks Related to Our Financing and Hedging Activities***. We finance a significant amount of our loans and investments through a variety of means, including CLOs, securitizations, credit facilities, equity capital, senior and convertible debt instruments, and other structured financings. These vehicles may contain restrictive covenants and may require us to provide additional collateral or repurchase assets if the value of pledged assets, some of which we guarantee, decline in value. If we are unable to acquire eligible investments, find suitable replacement investments and access financing sources on favorable terms, or at all, we may not be able to obtain the level of leverage necessary to optimize our return on investment and cash available for distribution to our stockholders may decline.

116.    The 2021 10-K further purported to warn of risks associated with failure to adequately assess the Company's risk of loss:

*Loan loss reserves are particularly difficult to estimate in a turbulent economic environment*. We perform a quarterly evaluation of our loans to determine whether an impairment charge is necessary and adequate to absorb probable losses. The valuation process requires certain estimates and judgments, which are more difficult to make during a period in which available commercial real estate credit is limited and commercial real estate transactions have decreased. Our estimates and judgments are based on several factors, including projected cash flows from the collateral securing our loans, loan structure, including the availability of reserves and recourse guarantees, likelihood of repayment in full at loan maturity, potential for refinancing by other lenders and expected market discount rates for varying property types. *If our estimates and judgments are not correct, our results of operations and financial condition could be severely impacted.*

117. The 2021 10-K additionally included the following misleading risk disclosure:

*We may be unable to invest excess capital on acceptable terms, or at all, which would adversely affect our operating results*. We may not be able to identify investments that meet our investment criteria and we may not be successful in closing the investments that we do identify. In addition, the investments that we fund with our capital may not produce a satisfactory return on capital, which would adversely affect our operating results.

118. These risk disclosures were materially misleading because they represented as merely hypothetical risk that had already materialized. Specifically, Arbor had substantially deviated from its own stated guidelines with respect to underwriting standards and had accordingly been originating a high volume of multifamily bridge loans that were at a heightened risk of default. Further, the Individual Defendants were specifically concealing the fact that the Company's practices were subjecting Arbor to heightened risk of loss.

119. With respect to Arbor's "Real Estate Values and Credit Risk," the 2021 10-K provided:

Commercial mortgage assets may be viewed as exposing an investor to greater risk of loss than residential mortgage assets since such assets are typically secured by larger loans to fewer obligors than residential mortgage assets. Multifamily and commercial property values, net operating income derived from such properties, and borrowers' credit ratings are subject to volatility and *may be* negatively affected by a number of factors, including, but not limited to, events such as natural disasters and pandemics, acts of war, terrorism, local economic and/or real estate conditions (such as industry slowdowns, oversupply of real estate space, occupancy

rates, construction delays and costs) and other macroeconomic factors beyond our control. The performance and value of our loan and investment and servicing portfolios depend on the borrowers' ability to operate the properties that serve as collateral so that they produce adequate cash flow to pay their loans. ***We attempt to mitigate these risks through our underwriting and asset management processes. Our asset management team reviews our portfolios consistently and is in regular contact with borrowers to monitor the performance of the collateral and enforce our rights as necessary.***

120.    Also on February 18, 2022, Arbor issued a press release titled "Arbor Realty Trust Reports Fourth Quarter and Full year 2021 Results and Increases Dividend for Seventh Consecutive Quarter to $0.37 per Share" (the "4Q21 Release"). The 4Q21 Release was attached as an exhibit to a current report, filed with the SEC on Form 8-K.

121.    The 4Q21 Release reported "GAAP net income of $0.71 and distributable earnings of $0.57 per diluted common share." The 4Q21 Release further stated:

> Arbor reported net income for the quarter of $106.0 million, or $0.71 per diluted common share, compared to net income of $96.6 million, or $0.80 per diluted common share for the quarter ended December 31, 2020. Net income for the year was $317.4 million, or $2.28 per diluted common share, compared to $163.4 million, or $1.41 per diluted common share for the year ended December 31, 2020. Distributable earnings for the quarter was $94.2 million, or $0.57 per diluted common share, compared to $67.4 million, or $0.49 per diluted common share for the quarter ended December 31, 2020. Distributable earnings for the year was $313.7 million, or $2.01 per diluted common share, compared to $234.9 million, or $1.75 per diluted common share for the year ended December 31, 2020.

122.    The 4Q21 Release additionally reported:

> During the fourth quarter of 2021, the Company ***recorded a $10.3 million reversal of provision for loan losses associated with CECL*** on the Company's loan and investment portfolio. At December 31, 2021, the Company's ***total allowance for loan losses was $113.2 million***. The Company had three non-performing loans with a carrying value of $22.7 million, before related loan loss reserves of $2.6 million, compared to six loans with a carrying value of $55.6 million, before related loan loss reserves of $2.6 million as of September 30, 2021.

123.    During a related earnings call, hosted by Arbor on the same day (the "4Q21 Earnings Call"), Defendant Kaufman stated:

[N]ot only do we generate strong risk-adjusted returns on our capital, which positively affect our current earnings, more importantly, ***we are also building a much higher-quality future earnings and dividend growth story by ensuring that our assets will provide us with multiple other products in the future***. And this is one of the major differentiators of our business platform, which is why we strongly believe we should consistently trade at a substantial premium and much lower dividend yield than anyone in our peer group.

\* \* \*

Turning now to our fourth quarter performance, as Paul will discuss in more detail, our quarterly financial results were once again remarkable. ***We produced distributable earnings of $0.62 per share***, which is well in excess of our current dividend, representing a payout ratio of around 60% for the fourth quarter and 70% for the full year 2021. In our balance sheet lending business, we had another outstanding quarter, producing record volumes of $4.3 billion. We are a top balance sheet lender in the industry and are seeing tremendous growth and efficiencies as we continue to scale our platform.

As a result, we grow our balance sheet book 122% in 2021 to $12.2 billion on record originations of $9.7 billion, and we have a very large pipeline, which gives us great confidence in our ability to continue to meaningfully grow our loan book in 2022. And again, ***these balance sheet loans create significant value for our platform***. They are not only accretive to our current earnings and dividends, but also ***allow us to build a pipeline for 2 to 3 years of new GSE agency and private label loans that produce additional long-dated income streams***, ensuring the long-term growth of our platform and creating high-quality earnings and dividends for the future.

We have consistently been a leader in the CLO securitization market, as financing ***our high-quality balance sheet portfolio*** with the appropriate liability structures continues to be one of our key business strategies. We are very successful in continuing to access the CLO securitization market in 2021, including closing our largest CLO to date, totaling $2.1 billion in the fourth quarter as well as closing another $2 billion CLO just last week. The utilization of these vehicles has contributed greatly to our success by allowing us to appropriately match-fund our assets with nonrecourse, nonmark-to-market, long-dated debt and generate attractive level of returns on our capital.

\* \* \*

In reflecting on 2021, we had an exceptional year and clearly outperformed our peer group. We are the best performing REIT 5 years in a row, delivering a 26% annualized return over the same time period. ***We are also well positioned for continued success in 2022 through our unique, multi-tiered, annuity-based operating platform that provides us with a future annuity of high-quality, long-***

*dated income streams*, making us confident in our ability to continue to grow our earnings and dividend and significantly outperform our peers.

124.    During the 4Q21 Earnings Call, Defendant Elenio stated:

[W]e had another exceptional quarter, producing distributable earnings of $94 million or $0.57 per share and $0.62 per share, excluding a onetime realized loss of $8 million on a non-multifamily asset that we were taking a reserve on during the height of the pandemic. We also had a record year with distributable earnings of $2.01 per share in 2021, a 15% increase over our 2020 results. And these results translated into industry-high ROEs again of approximately 19% in 2021, allowing us to increase our dividend to an annual run rate of $1.48 a share, reflecting 4 increases in 2021 and 7 consecutive quarterly increases, representing a 23% increase over that time span.

125.    Later during the 4Q21 Earnings Call, Steven Cole Delany, an analyst from JMP

Securities LLC, asked the following question:

Ivan and Paul, congratulations on an excellent close to last year. I think the thing that jumped off the page the most to me, it's a lot of good things in the report and in the year. But the dramatic growth in your structured business in terms of origination volume, you did $9.7 billion, but $6.8 billion or 70% of that came in the second half of the year. So my question is, the strong demand that you're seeing for multifamily bridge loans in the market, do you expect that to carry over into 2022, and is it possible that 2022 could set a new record for origination volume in the structured business?

126.    In response, Defendant Kaufman stated:

Clearly, there was a little bit of a shift in the environment, and I'll give you some of the reasons for it, and why we're so well-positioned and so dominant in that space. And if we got more personnel and mobility, we could probably have done more. We limited what we could do, and we're still limiting what we could do. I think with the huge jump in rates of rental rates and is between 10% to 25% increase in rents from people buying properties and not going for permanent financing. So they're going for more transitional financing before they get to the permanent financing. So it's a very, very big shift.

Through the COVID period, rents were fairly flat and then right after the initial periods of COVID, rents really accelerated. *So people are buying multifamily properties, taking a year to 2 years to turn those rents and then getting the benefit of an increased NOI and then go for permanent*. So that's been the shift in the market. *We are the best balance sheet lender in the business when it comes to multifamily. We do a great job*. And that business has grown just dramatically. We've probably turned away just a huge amount of business.

34

In terms of the outlook for 2022, we are running at about $1 billion a month in -- on our books for closings for the first quarter. We are still turning down a significant amount of business. We have restrictions. Human capital is a very, very big restriction today. As we all know, hiring people, retaining people is a big task. We're doing a good job with retention, but hiring new people is very difficult. So right now, the outlook on the balance sheet is still very strong and we still are a market leader in that place in the market.

127.    An analyst from JPMorgan then asked the following question:

[W]hen we think about the structured business, I kind of think of that as potential energy ultimately for the agency business. And when we look at the terms of those loans, that's clearly the business model. I am curious, when you underwrite loans and think about business plans, are you starting to contemplate higher interest rates or exits as you're taking on those loans within the structured product business with the idea that it may be more expensive for managers, owners to get financing?

128.    In response, Defendant Kaufman stated:

We are constantly readjusting our models based on different economics *and we always underwrite our bridge loans to where the takeout is going to be and we use a certain constant.* So that's something that's different about the way we do our business. Back in November, we actually took a look at where the market is, we took a look at where rents have increased to, readjusted our forecast on rent growth a little bit. While we have exorbitant rent growth, we readjusted our rent growth, because people are starting to think that 10% and 20% rent growth is going to last forever. We think that level of rent growth is going to subside this year as they turn [ new ] units and the market adjusts and then we readjusted our rent growth back to a 3% normalized rate. So that's a very big adjustment.

In terms of increasing the constant that we're using, we are constantly adjusting to where the market is. It's something that we do traditionally. *We've also reallocated our pricing to be more aggressive on lower loan-to-value in primary markets, starting in November. So we've adjusted our portfolio of lending programs as well on a credit basis. So we're sensitized to all of those different factors in our underwriting.*

129.    In response to a question regarding "changes in sentiment behavior or underwriting on the part of investors" in the context of interest rates, Defendant Kaufman stated:

I don't think we've seen much of a change. I mean, clearly, loan proceeds are going to be cut with rates going up. There has been a very significant rise in the 10-year from a range of 1.50, now a range of 1.90 to 2 in a quarter in my book and that's definitely affecting loan proceeds for people. *And it's pretty consistent,*

***underwriting guidelines haven't changed that much***. I think just the amount of proceeds people are taking out or the amount of equity that has to go in is going to be changing on a go-forward basis. I think you'll see a little bit of a shift, maybe to 5- and 7-year products, so people can get a little more proceeds. So there may be a shift a little bit from a 10-year product down to a 5 and 7, but you'll have to see a little bit more equitization in transactions today in order to qualify for long-term fixed-rate financing.

130.    On May 6, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the first fiscal quarter of 2022 (the "1Q22 10-Q"), which reported $79.9 million in quarterly net income, compared to a net income of $81.1 million during the same period of the prior year. The 1Q22 10-Q further reported net income attributable to common stockholders of $64.1 million, or $0.40 per diluted common share, compared to a net income of $69.5 million, or $0.55 per diluted common share during the same period of the prior year.

131.    With respect to the Company's "provision for credit losses (net of recoveries)," Arbor reported a $2.4 million provision for loan losses associated with CECL. With respect to the Company's "Allowance for Credit Losses," Arbor provided the following "summary of the changes in the allowance for credit losses . . . (in thousands)":

| | Land | Multifamily | Office | Retail | Student Housing | Hotel | Healthcare | Other | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Three Months Ended March 31, 2022** | | | | |
| Allowance for credit losses: | | | | | | | | | |
| Beginning balance | $ 77,970 | $ 18,707 | $ 8,073 | $ 5,819 | $ 636 | $ 8 | $ 8 | $ 2,020 | $ 113,241 |
| Provision for credit losses (net of recoveries) | (30) | 3,377 | 12 | — | (312) | (4) | (3) | 101 | 3,141 |
| Ending balance | $ 77,940 | $ 22,084 | $ 8,085 | $ 5,819 | $ 324 | $ 4 | $ 5 | $ 2,121 | $ 116,382 |

132.    The 1Q22 10-Q further reported $92.9 million in distributable earnings, or $0.55 per diluted common share, compared to $75.1 million, or $0.52 per diluted common share during the same period of the prior year.

133.    In a section titled "Concentration of Credit Risk," the 1Q22 10-Q stated, in pertinent part:

We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and

a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

134.    The 1Q22 10-Q further provided the following "summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at March 31, 2022 . . . (\$ in thousands)," including, *inter alia*, the "Multifamily" asset class:

| Asset Class / Risk Rating | 2022 | 2021 | 2020 | 2019 | 2018 | Prior | Total |
|---|---|---|---|---|---|---|---|
| **Multifamily:** | | | | | | | |
| Pass | $ 1,503,537 | $ 5,251,052 | $ 475,716 | $ 35,332 | $ — | $ 49,100 | $ 7,314,737 |
| Pass/Watch | 865,188 | 2,438,626 | 384,715 | 181,379 | 99,250 | 350 | 3,969,508 |
| Special Mention | 132,660 | 748,587 | 309,846 | 351,985 | 64,200 | 32,500 | 1,639,778 |
| Substandard | — | 7,400 | 18,582 | 32,370 | — | 8,250 | 66,602 |
| Total Multifamily | $ 2,501,385 | $ 8,445,665 | $ 1,188,859 | $ 601,066 | $ 163,450 | $ 90,200 | $ 12,990,625 |

135.    The 1Q22 10-Q reported that the Company's weighted average Last Dollar LTV Ratio for its total multifamily asset class was 77%.

136.    Also on May 6, 2022, Arbor issued a press release titled "Arbor Realty Trust Reports First Quarter 2022 Results and Increases Quarterly Dividend to \$0.38 per Share" (the "1Q22 Release"). The 1Q22 Release was attached as an exhibit to a current report, filed with the SEC on Form 8-K.

137.    The 1Q22 10-Q reported "GAAP net income of \$0.55 and distributable earnings of

$0.52 per diluted common share." The 1Q22 Release further stated:

> Arbor reported net income for the quarter of $69.1 million, or $0.51 per diluted common share, compared to net income of $44.1 million, or $0.40 per diluted common share for the quarter ended June 30, 2020. Distributable earnings for the quarter was $68.8 million, or $0.45 per diluted common share, compared to $59.8 million, or $0.45 per diluted common share for the quarter ended June 30, 2020.

138.    The 1Q22 10-Q further reported:

> Arbor reported net income for the quarter of $64.1 million, or $0.40 per diluted common share, compared to net income of $69.5 million, or $0.55 per diluted common share for the quarter ended March 31, 2021. Distributable earnings for the quarter was $92.9 million, or $0.55 per diluted common share, compared to $75.1 million, or $0.52 per diluted common share for the quarter ended March 31, 2021.

139.    In addition, the 1Q22 10-Q provided that:

> During the first quarter of 2022, the Company recorded a $3.1 million provision for loan losses associated with CECL on the Company's loan and investment portfolio. At March 31, 2022, the Company's total allowance for loan losses was $116.4 million. The Company had four non-performing loans with a carrying value of $25.2 million, before related loan loss reserves of $5.1 million, compared to three loans with a carrying value of $22.7 million, before related loan loss reserves of $2.6 million as of December 31, 2021.

140.    During a related earnings call, hosted by Arbor on the same day (the "1Q22 Earnings Call"), Defendant Kaufman stated the following with respect to the Company's first quarter financial performance:

> Turning now to our first quarter performance. As Paul will discuss in more detail, our quarterly financial results were once again remarkable. We produced **distributable earnings of $0.55 per share**, which is well in excess of our current dividend, representing a payout ratio of around 70%.
>
> In our balance sheet business, we had another outstanding quarter. As one of the top multifamily balance sheet lenders in the industry, we continue to see opportunities for significant growth. As a result, we grew our balance sheet loan book another 17% in the first quarter to $14.2 billion on $2.8 billion of new originations. We also have a very robust pipeline, which gives us great confidence in our ability to continue to meaningfully grow our loan book for the balance of the year. **And again, these balance sheet loans create significant value for our platform as they are not only accretive to our current earnings and dividends, but also allow us to build a pipeline for 2 to 3 years of new GSE/Agency and private**

> *label loans that produce additional long-term dated income streams, ensuring the long-term growth of our platform and creating high-quality earnings and dividends for the future.*

141.    During the 1Q22 Earnings Call, Defendant Kaufman highlighted the Company's recent CLO activity, stating that Arbor has "consistently been a leader in the CLO securitization market as our financing and high-quality balance sheet portfolio with the appropriate liability structures continues to be one of the key business strategies."

142.    Defendant Kaufman concluded his prepared remarks, stating:

> In summary, we had another tremendous quarter, allowing us to once again increase our dividend. *We strategically built our platform with multiple products that produce many diverse income streams, which provides us with the future annuity of high-quality, long-dated reoccurring earnings.* We're also the premier multifamily originator in this space, and *we are invested in the right asset classes with very stable liability structures, which positions us extremely well to succeed in every market cycle and gives us great confidence in our ability to continue to significantly outperform our peers.*

143.    Later during the 1Q22 Earnings Call, Defendant Elenio touted Arbor's "exceptional" financial performance during the quarter, stating, in pertinent part, that the Company "had another exceptional quarter, producing distributable earnings of $93 million or $0.55 per share. These results translated into industry higher ROEs of approximately 18%, allowing us to once again increase our dividend for the eighth consecutive quarter to an annual run rate of $1.52 per share."

144.    On July 29, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the second fiscal quarter of 2022 (the "2Q22 10-Q"), which reported $88.1 million in quarterly net income, compared to a net income of $84.3 million during the same period of the prior year. The 2Q22 10-Q further reported net income attributable to common stockholders of $69.9 million, or $0.43 per diluted common share, compared to a net income of $69.1 million, or $0.51 per diluted common share during the same period of the prior year.

145.    With respect to the Company's "provision for credit losses (net of recoveries)," Arbor reported a $5.1 million provision for loan losses associated with CECL. With respect to the Company's "Allowance for Credit Losses," Arbor provided the following "summary of the changes in the allowance for credit losses . . . (in thousands)":

| | Three Months Ended June 30, 2022 | | | | | | | | |
| | Land | Multifamily | Office | Retail | Student Housing | Hotel | Healthcare | Other | Total |
|---|---|---|---|---|---|---|---|---|---|
| Allowance for credit losses: | | | | | | | | | |
| Beginning balance | $ 77,940 | $ 22,084 | $ 8,085 | $ 5,819 | $ 324 | $ 4 | $ 5 | $ 2,121 | $ 116,382 |
| Provision for credit losses (net of recoveries) | (22) | 5,874 | (1,054) | — | (163) | 12 | (2) | 304 | 4,949 |
| Ending balance | $ 77,918 | $ 27,958 | $ 7,031 | $ 5,819 | $ 161 | $ 16 | $ 3 | $ 2,425 | $ 121,331 |

146.    The 2Q22 10-Q further reported $93.7 million in distributable earnings, or $0.52 per diluted common share, compared to $68.8 million, or $0.45 per diluted common share during the same period of the prior year.

147.    In a section titled "Concentration of Credit Risk," the 2Q22 10-Q stated, in pertinent part:

We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

148.    The 2Q22 10-Q further provided the following "summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at June 30, 2022 . . . ($ in thousands)," including, *inter alia*, the "Multifamily" asset class:

| Asset Class / Risk Rating | 2022 | 2021 | 2020 | 2019 | 2018 | Prior | Total |
|---|---|---|---|---|---|---|---|
| **Multifamily:** | | | | | | | |
| Pass | $ 1,181,993 | $ 2,106,750 | $ 86,978 | $ — | $ — | $ 20,300 | $ 3,396,021 |
| Pass/Watch | 2,288,500 | 3,644,880 | 643,991 | 169,310 | 51,450 | 32,850 | 6,830,981 |
| Special Mention | 798,856 | 2,182,343 | 288,038 | 296,970 | 64,200 | 8,250 | 3,638,657 |
| Substandard | — | 7,400 | 20,400 | 40,325 | — | — | 68,125 |
| Total Multifamily | $ 4,269,349 | $ 7,941,373 | $ 1,039,407 | $ 506,605 | $ 115,650 | $ 61,400 | $ 13,933,784 |

149.    The 2Q22 10-Q reported that the Company's weighted average Last Dollar LTV Ratio for its total multifamily asset class was 77%.

150.    Also on July 29, 2022, Arbor issued a press release titled "Arbor Realty Trust Reports Second Quarter 2022 Results and Increases Dividend for Ninth Consecutive Quarter to $0.39 per Share" (the "2Q22 Release"). The 2Q22 Release was attached as an exhibit to a current report, filed with the SEC on Form 8-K.

151.    The 2Q22 Release reported "GAAP net income of $0.41 and distributable earnings of $0.52 per diluted common share." The 2Q22 Release further stated:

Arbor reported net income for the quarter of $69.9 million, or $0.41 per diluted common share, compared to net income of $69.1 million, or $0.51 per diluted common share for the quarter ended June 30, 2021. Distributable earnings for the quarter was $93.7 million, or $0.52 per diluted common share, compared to $68.8 million, or $0.45 per diluted common share for the quarter ended June 30, 2021.

152.    The 2Q22 Release additionally reported:

During the second quarter of 2022, the Company *recorded a $4.9 million provision* for loan losses associated with CECL, which was net of a $1.5 million loan loss recovery. At June 30, 2022, the Company's *total allowance for loan losses was $121.3 million*. The Company had four non-performing loans with a carrying value of $25.2 million, before related loan loss reserves of $5.1 million, which is unchanged from March 31, 2022.

153.    During a related earnings call, hosted by Arbor on the same day (the "2Q22 Earnings Call"), Defendant Kaufman stated the following, in pertinent part:

Additionally, we have successfully operated our business through multiple cycles and have a very seasonal and experienced asset management team that positions us exceptionally well to succeed in this cycle as well. These are significant differentiating factors from the rest of our peer group, most of which have monoline businesses which struggle to maintain their dividend and like the experience and expertise to manage through this downturn.

And this is why we believe we are superiorly positioned or in a class by ourselves and should trade a substantial premium at a much lower dividend yield than anyone in our peer group. Turning now to our second quarter, as Paul will discuss in more detail, our quarterly financial results were once again remarkable. We produced ***distributable earnings of $0.52 per share***, which is well in excess of our current dividend, representing a payout ratio of around 75%. ***Our financial results will also benefit greatly from rising interest rates, which will significantly increase the net interest income on our floating rate loan book as well as earnings on our escrow balances.***

\* \* \*

As a result, we recently decided to sell $300 million of multifamily bridge loans, which generated $90 million of fresh capital. We also retained a portion of the upfront origination fees and all of the potential exit fees as well as a 12.5 basis point servicing fee and control over the takeout of each loan, which is vital to our business strategy as *these balance sheet loans provide us with a pipeline for 2 to 3 years of* new GSE/Agency loans and produce additional long-dated income streams.

\* \* \*

In our GSE/Agency and private label programs, we originated $1.2 billion of loans in the second quarter. ***We also have a robust pipeline what will give us confidence in our ability to produce consistent volumes for the rest of the year***. Our GSE/Agency platform continues to offer a premium value as it requires limited capital and generates significant long-dated, predictable income streams and produces significant annual cash flow.

\* \* \*

In summary, we had another tremendous quarter, allowing us to once again increase our dividend. ***We strategically built our platform to operate successfully in all cycles with multiple products that produce many diverse income streams providing us with a future annuity of high-quality, long-dated reoccurring earnings. We are also the premium multifamily originator in this space and are invested in the right asset classes with very stable liability structures and are well capitalized, which positions us extremely well to succeed in this environment*** and to continue to significantly outperform our peers.

154.    The statements identified above regarding the Company's "financial results benefit[ting] greatly from rising interest rates" were materially misleading. By choosing to discuss the impacts of rising interest rates on the Company's financial performance, Defendant Kaufman was obligated to disclose that the highlighted positive impact was unsustainable. Specifically, rising interest rates substantially increased the likelihood that the majority of the borrowers in Arbor's variable-rate loan portfolio would default.

155.    Later during the 2Q22 Earnings Call, Defendant Elenio stated:

[W]e had another exceptional quarter, producing distributable earnings of $94 million or $0.52 per share. These results translated into industry high ROEs again of approximately 17%, allowing us to once again increase our dividend for the ninth consecutive quarter to an annual run rate of $1.56 a share.

Net interest income, on the other hand, on our balance sheet loan book increased $10.8 million this quarter from portfolio growth and significant increases in LIBOR and SOFR rates during the quarter. And as the current LIBOR and SOFR curves are predicted to continue to increase, *it's very important to note that any further increases in these rates will continue to increase the net interest income spreads* in our floating rate loan book.

156.    Also during the 2Q22 Earnings Call, Richard Barry Shane ("Shane"), an analyst from JPMorgan, asked the following question:

I'm just curious in the current environment with the movement in collateral values with potential delays related to supply chain and labor shortages in terms of timelines on construction. And finally, any sort of vacancy absorption, is it realistic that we will see paper or loans stay in the -- on the balance sheet longer before they are migrated for Agency sales?

157.    In response, Defendant Kaufman stated:

So there's two ways to look at that. We actually think, on our balance sheet, there could be a facilitation to Agency execution because of the way the yield curve is. If people are borrowing at 350 over 400 over, then SOFR is driven to a level of -- with a borrower cost of 6%, you can execute on to Agency at -- maybe 1.50 to 1.75 over the 10 year, you have kind of an inverted yield curve. So we're seeing a lot of people, and we're talking for them to convert them off the balance sheet from a 6% -- 5.5% to 6% pay rate would potentially move up in SOFR and more risks and cap costs into a 10-year fixed rate of 4.25% to 4.5%.

*So for those products that were put on a year ago, 1.5 years ago, I think we're going to see some real movement, which is going to help maintain our Agency volumes*. That's on that side of the coin. And to our surprise, you have a 10-year or 2.75, that's pretty low. So I think we'll see that happen maybe a little quicker than we thought.

158.    Shane followed up by asking, "given the floating rate nature of the loans, do you require borrowers to take any interest rate protection in the form of caps?" In response, Defendant Kaufman stated:

*Yes, our loans require caps*. Some of them have spring caps. *Most of the loans have a lot of caps* and of course, the rates were moving up. *All these caps were -- if they weren't in place, it will be put in place and that was a whole process. So a majority of our loans are significant. Super majority of our loans have those caps.*

159.    Also during the 2Q22 Earnings Call, in response to a question regarding "the credit quality of the existing [bridge loan] portfolio," Defendant Kaufman stated:

So I think when I mentioned earlier, Jade, that we had 8 price increases over the last 9 months, commensurate with that, *we also adjusted our underwriting standards step by step by step. We've adjusted them by having lower LTVs. I think our LTVs from 9 months ago until now on the originations basis, probably 7 percentage points less. We've adjusted our exit test because as we've talked on this call when we do a bridge loan, every bridge loan is underwritten to agency execution and final takeout.*

So we kept adjusting those underwriting standards. *So we feel very comfortable with the book that we put on over the last 9 months*. In addition, a lot of our loans have a lot of different rebalance and tests that have good structural enhancements. *So we're real comfortable with what we have in place and the way we manage our book and features on them and our asset management capability.*

So we've begun to go through our portfolio. We've begun to work with our borrowers and making sure that they have adequate interest reserves and replenishments to take it into consideration a rise in interest rates. *And we're comfortable with the way we're running our outlook.*

160.    Later during the 2Q22 Earnings Call, the following exchange occurred between Defendant Kaufman and Jade Joseph Rahmani ("Rahmani"), an analyst from Keefe, Bruyette, & Woods, Inc.:

**Rahmani**

And on the multifamily rent growth side, it seems that rents are continuing to be very robust in the market. Across the servicing portfolio and the bridge loan portfolio in your surveillance, are you seeing continued strong rent growth? And are you seeing the transitional loans, those projects hit their business plans?

**Defendant Kaufman**

I think that the rent growths have far exceeded all of our underwriting and all our expectations. I mean you're seeing 10% to 20% rent growth. You're seeing people not having to use their renovation dollars to turn their units and get their rent growth. So the rent growth story is still strong. I would put a caution on that, a little different than the rest of the marketplace having been through a lot of cycles.

I think if you're looking at a recession, we're going to lower rent growth going forward. And we're also going to a little bit higher in economic vacancy. So we're still optimistic about what's in the portfolio and the rent rolls, but we are proceeding with some level of caution for 2023 with probably flat to 3% rent growth and 1 to 2 points higher in economic vacancy. That's how we're looking at 2022.

**Rahmani**

And under that scenario, what kind of delinquency rates or default rates does that imply? Anything material?

**Defendant Kaufman**

*Nominal. Not anything that significant, not anything that we can't handle and* **not anything that's not within our capital projections.**

161.    On November 4, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the third fiscal quarter of 2022 (the "3Q22 10-Q"), which reported $79.1 million in quarterly net income, compared to a net income of $86.1 million during the same period of the prior year. The 3Q22 10-Q further reported net income attributable to common stockholders of $62.7 million, or $0.37 per diluted common share, compared to a net income of $72.8 million, or $0.51 per diluted common share during the same period of the prior year.

162.    With respect to the Company's "provision for credit losses (net of recoveries)," Arbor reported a $2.3 million provision for loan losses associated with CECL. With respect to the Company's "Allowance for Credit Losses," Arbor provided the following "summary of the changes in the allowance for credit losses . . . (in thousands)":

| | | Land | | Multifamily | | Office | | Retail | Student Housing | | Hotel | | Healthcare | | Other | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Three Months Ended September 30, 2022 | | | | | | | | | |
| Allowance for credit losses: | | | | | | | | | | | | | | | | | |
| Beginning balance | $ | 77,918 | $ | 27,958 | $ | 7,031 | $ | 5,819 | | 161 | $ | 16 | $ | 3 | $ | 2,425 | $ | 121,331 |
| Provision for credit losses (net of recoveries) | | (8) | | (675) | | 306 | | — | | 14 | | 2 | | 1 | | 1,325 | | 965 |
| Ending balance | $ | 77,910 | $ | 27,283 | $ | 7,337 | $ | 5,819 | $ | 175 | $ | 18 | $ | 4 | $ | 3,750 | $ | 122,296 |

163.    The 3Q22 10-Q additionally included the following "summary of [Arbor's] non-performing loans by asset class . . . (in thousands)":

| | | September 30, 2022 | | | | | December 31, 2021 | | |
|---|---|---|---|---|---|---|---|---|---|
| | | UPB | | Less Than 90 Days Past Due | | Greater Than 90 Days Past Due | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
| Student Housing | $ | 20,500 | $ | — | $ | 20,500 | $ 21,500 | $ — | $ 21,500 |
| Retail | | 3,445 | | — | | 3,445 | 920 | — | 920 |
| Commercial | | 1,700 | | — | | 1,700 | 1,700 | — | 1,700 |
| Total | $ | 25,645 | $ | — | $ | 25,645 | $ 24,120 | $ — | $ 24,120 |

164.    The 3Q22 10-Q further reported $105.1 million in distributable earnings, or $0.56 per diluted common share, compared to $75.7 million, or $0.47 per diluted common share during the same period of the prior year.

165.    In a section titled "Concentration of Credit Risk," the 3Q22 10-Q stated, in pertinent part:

We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating,

46

subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

166.    The 3Q22 10-Q further provided the following "summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at September 30, 2022 . . . ($ in thousands)," including, *inter alia*, the "Multifamily" asset class:

| Asset Class / Risk Rating | UPB by Origination Year | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | 2019 | 2018 | Prior | | |
| **Multifamily:** | | | | | | | | |
| Pass | $ 278,255 | $ 302,181 | $ 5,935 | $ 38,375 | $ — | | 20,300 | $ 645,046 |
| Pass/Watch | 3,208,311 | 4,006,812 | 599,665 | 279,891 | 41,650 | | — | 8,136,329 |
| Special Mention | 1,132,268 | 3,354,479 | 197,450 | 91,917 | 64,000 | | 7,594 | 4,847,708 |
| Substandard | — | 10,125 | 52,350 | 40,325 | | | — | 102,800 |
| Total Multifamily | $ 4,618,834 | $ 7,673,597 | $ 855,400 | $ 450,508 | $ 105,650 | $ | 27,894 | $ 13,731,883 |

167.    The 3Q22 10-Q reported that the Company's weighted average Last Dollar LTV Ratio for its total multifamily asset class was 77%.

168.    Also on November 4, 2022, Arbor issued a press release titled "Arbor Realty Trust Reports Third Quarter 2022 Results and Increases Dividend for Tenth Consecutive Quarter to $0.40 per Share" (the "3Q22 Release"). The 3Q22 Release was attached as an exhibit to a current report, filed with the SEC on Form 8-K.

169.    The 3Q22 Release reported "GAAP net income of $0.36 per diluted common share" and "distributable earnings of $0.56 per diluted common share, well in excess of our current dividend, representing a 71% payout ratio." The 3Q22 Release further stated:

Arbor reported net income for the quarter of $62.7 million, or $0.36 per diluted common share, compared to net income of $72.8 million, or $0.51 per diluted common share for the quarter ended September 30, 2021. Distributable earnings for the quarter was $105.1 million, or $0.56 per diluted common share, compared to $75.7 million, or $0.47 per diluted common share for the quarter ended September 30, 2021.

170.    The 3Q22 Release additionally reported:

During the third quarter of 2022, the Company *recorded a $1.0 million provision for loan losses associated with CECL*. At September 30, 2022, the Company's

*total allowance for loan losses was $122.3 million*. The Company **had four nonperforming loans with a carrying value of $24.2 million**, before related loan loss reserves of $5.1 million, compared to four loans with a carrying value of $25.2 million, before related loan loss reserves of $5.1 million at June 30, 2022.

171.    During a related earnings call, hosted by the Company on the same day (the "3Q22 Earnings Call"), Defendant Kaufman stated, in pertinent part:

> Turning now to our third quarter performance, as Paul will discuss in more detail. Our quarterly financial results were once again remarkable. We produced **distributable earnings of $0.56 per share**, which is well in excess of our current dividend, representing a payout ratio of around 71%. **Our financial results continue to benefit greatly from rising interest rates, which has significantly increased our net interest income on our floating rate loan book** as well as earnings on our escrow balances.

172.    Defendant Kaufman further represented that "**[w]e have also placed a heavy focus on converting our multifamily bridge loan runoff into agency loans, which is a critical part of our business strategy**, as our Agency Business is capital-light and produces significant additional long-dated income streams." Defendant Kaufman continued, stating:

> In our GSE/Agency business, we originated another $1.1 billion of loans in the third quarter. October's originations came in at $250 million, and we have seen some leveling off in the pipeline given the rise in the tenure. Despite the current rate environment, **we believe we can close out the fourth quarter with a similar volume as the third quarter, as, again, we** have a strategic advantage in that we focus on the workforce housing part of the market, and **have a large multifamily balance sheet loan book that naturally feeds our Agency Business.**

173.    On February 17, 2023, the Company filed its 2022 annual report on Form 10-K with the SEC (the "2022 10-K"), which was signed by Defendants Kaufman, Elenio, Bacon, Effron, Farrell, Green, Lazar, Martello, and Schwartz. The 2022 10-K reported $353.8 million in net income for the year, compared to a net income of $377.8 million during the prior year. The 2022 10-K further reported net income attributable to attributable to common stockholders of $284.8 million, compared to a net income of $317.4 million during the prior year. The 2022 10-K additionally reported a provision reversal of $21.2 million for loan losses associated with CECL,

compared to a provision of $21.1 million the prior year.

174.    In discussing the Company's "Other Expenses," the 2022 10-K stated:

We recorded CECL provisions totaling $23.0 million during 2022 and a provision recovery of $27.3 million during 2021. The CECL provision in 2022 primarily reflects increases in our loans and investments balance, as a result of portfolio growth, along with rising interest rates and inflation in our CECL models for our Structured Business, which predominantly consists of variable rate loans. The provision recovery during 2021 was primarily due to the reversal of CECL reserves in both business segments in connection with improved market conditions and expected future forecasts.

175.    With respect to the Company's "Allowance for Credit Losses," Arbor provided the following "summary of the changes in the allowance for credit losses . . . (in thousands)":

| | Land | Multifamily | Office | Retail | Student Housing | Healthcare | Hotel | Other | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Allowance for credit losses:** | | | | | | | | | |
| Beginning balance | $ 77,970 | $ 18,707 | $ 8,073 | $ 5,819 | $ 636 | $ 8 | $ 8 | $ 2,020 | $ 113,241 |
| Provision for credit losses (net of recoveries) | 98 | 19,254 | 89 | — | (598) | 8 | 6 | 461 | 19,318 |
| Ending balance | $ 78,068 | $ 37,961 | $ 8,162 | $ 5,819 | $ 38 | $ 16 | $ 14 | $ 2,481 | $ 132,559 |

176.    The 2022 10-K additionally included the following "summary of [Arbor's] non-performing loans by asset class . . . (in thousands)":

| | December 31, 2022 | | | December 31, 2021 | | |
|---|---|---|---|---|---|---|
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
| Multifamily | $ 2,605 | $ — | $ 2,605 | $ — | $ — | $ — |
| Retail | 3,445 | — | 3,445 | 920 | — | 920 |
| Commercial | 1,700 | — | 1,700 | 1,700 | — | 1,700 |
| Student Housing | — | — | — | 21,500 | — | 21,500 |
| Total | $ 7,750 | $ — | $ 7,750 | $ 24,120 | $ — | $ 24,120 |

177.    The 2022 10-K further reported $405.7 million in distributable earnings, or $2.23 per diluted common share, compared to $313.7 million, or $2.01 per diluted common share during the prior year.

178.    In a section titled "Concentration of Credit Risk," the 2022 10-K stated, in pertinent part:

We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and

a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

179.    The 2022 10-K further provided the following "summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at December 31, 2022 . . . ($ in thousands)," including, *inter alia*, the "Multifamily" asset class:

| Asset Class / Risk Rating | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | 2019 | 2018 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $ 468,655 | $ 744,231 | $ 10,135 | $ — | $ — | $ 20,300 | $ 1,243,321 |
| Pass/Watch | 3,163,624 | 3,385,114 | 523,057 | 335,573 | 41,650 | — | 7,449,018 |
| Special Mention | 1,193,665 | 2,843,508 | 34,575 | 7,285 | — | 7,594 | 4,086,627 |
| Substandard | — | 255,779 | 26,700 | 22,975 | 32,500 | — | 337,954 |
| Total Multifamily | $ 4,825,944 | $ 7,228,632 | $ 594,467 | $ 365,833 | $ 74,150 | $ 27,894 | $ 13,116,920 |

180.    The 2022 10-K reported that the Company's weighted average Last Dollar LTV Ratio for its total multifamily asset class was 77%.

181.    The 2022 10-K further included the following generic and misleading risk disclosure:

***Increases in loan loss reserves and other impairments are likely if economic conditions deteriorate***. A decline in economic conditions could negatively impact the credit quality of our loan and investment portfolio and could cause us to

experience increases in loan loss reserves, defaulted loans and other asset impairment charges.

182.    The 2022 10-K purported to warn of risks "Related to [Arbor's] Financing and Hedging Activities":

> ***Risks Related to Our Financing and Hedging Activities.*** We finance a significant amount of our loans and investments through a variety of means, including CLOs, securitizations, credit facilities, equity capital, senior and convertible debt instruments, and other structured financings. These vehicles may contain restrictive covenants and may require us to provide additional collateral or repurchase assets if the value of pledged assets, some of which we guarantee, decline in value. If we are unable to acquire eligible investments, find suitable replacement investments and access financing sources on favorable terms, or at all, we may not be able to obtain the level of leverage necessary to optimize our return on investment and cash available for distribution to our stockholders may decline.

183.    The 2022 10-K further purported to warn of risks associated with failure to adequately assess the Company's risk of loss:

> ***Loan loss reserves are particularly difficult to estimate in a turbulent economic environment***. We perform a quarterly evaluation of our loans to determine whether an impairment charge is necessary and adequate to absorb probable losses. The valuation process requires certain estimates and judgments, which are more difficult to make during a period in which available commercial real estate credit is limited and commercial real estate transactions have decreased. Our estimates and judgments are based on several factors, including projected cash flows from the collateral securing our loans, loan structure, including the availability of reserves and recourse guarantees, likelihood of repayment in full at loan maturity, potential for refinancing by other lenders and expected market discount rates for varying property types. ***If our estimates and judgments are not correct, our results of operations and financial condition could be severely impacted.***

184.    The 2022 10-K included the following misleading risk disclosure related to loan repayments:

> ***Loan repayments are less likely in a volatile market environment***. Loan repayments are a significant source of liquidity for us. If borrowers are unable to refinance loans at maturity, the loans could go into default and the liquidity that we expect to receive from such repayments may not be available. Further, in the event the commercial real estate finance market deteriorates, borrowers that have extension rights will be more likely to exercise such rights, which will further delay our ability to access liquidity through repayments.

* * *

> Volatility in values of multifamily and commercial properties may adversely affect our loans and investments. …In the event a property's net operating income decreases, a borrower may have difficulty repaying our loan, which could result in losses to us. In addition, decreases in property values reduce the value of the collateral and the potential proceeds available to a borrower to repay our loans, which could negatively impact our operating results.

185.    The 2022 10-K included the following misleading risk disclosure:

> ***We may be unable to invest excess capital on acceptable terms, or at all, which would adversely affect our operating results.*** We may not be able to identify investments that meet our investment criteria and we may not be successful in closing the investments that we do identify. In addition, the investments that we fund with our capital may not produce a satisfactory return on capital, which would adversely affect our operating results.

186.    With respect to rising interest rates, the 2022 10-K stated that "rising interest rates will positively impact our net interest income since our structured loan portfolio exceeds our corresponding debt balances and the vast majority of our loan portfolio is floating-rate based on SOFR or LIBOR."

187.    With respect to Arbor's "Real Estate Values and Credit Risk," the 2022 10-K stated:

> Commercial mortgage assets may be viewed as exposing an investor to greater risk of loss than residential mortgage assets since such assets are typically secured by larger loans to fewer obligors than residential mortgage assets. Multifamily and commercial property values, net operating income derived from such properties, and borrowers' credit ratings are subject to volatility and ***may be*** negatively affected by a number of factors, including, but not limited to, events such as natural disasters and pandemics, acts of war, terrorism, local economic and/or real estate conditions (such as industry slowdowns, oversupply of real estate space, occupancy rates, construction delays and costs) and other macroeconomic factors beyond our control. The performance and value of our loan and investment and servicing portfolios depend on the borrowers' ability to operate the properties that serve as collateral so that they produce adequate cash flow to pay their loans. ***We attempt to mitigate these risks through our underwriting and asset management processes. Our asset management team reviews our portfolios consistently and is in regular contact with borrowers to monitor the performance of the collateral and enforce our rights as necessary.***

188.    Also on February 17, 2023, Arbor issued a press release titled "Arbor Realty Trust Reports Fourth Quarter and Full Year 2022 Results and Declares Dividend of $0.40 per Share" (the "4Q22 Release"). The 4Q22 Release was attached as an exhibit to a current report, filed with the SEC on Form 8-K.

189.    The 4Q22 Release reported "GAAP net income of $0.49 per diluted common share" and "distributable earnings of $0.60 per diluted common share, well in excess of our current dividend, representing a 67% payout ratio." The 4Q22 Release further stated:

> Arbor reported net income for the quarter of $88.2 million, or $0.49 per diluted common share, compared to net income of $106.0 million, or $0.71 per diluted common share for the quarter ended December 31, 2021. Net income for the year was $284.8 million, or $1.67 per diluted common share, compared to $317.4 million, or $2.28 per diluted common share for the year ended December 31, 2021. Distributable earnings for the quarter was $114.0 million, or $0.60 per diluted common share, compared to $94.2 million, or $0.57 per diluted common share for the quarter ended December 31, 2021. Distributable earnings for the year was $405.7 million, or $2.23 per diluted common share, compared to $313.7 million, or $2.01 per diluted common share for the year ended December 31, 2021.

190.    The 4Q22 Release additionally reported:

> During the fourth quarter of 2022, the Company **recorded a $10.3 million provision for loan losses associated with CECL**. At December 31, 2022, the Company's **total allowance for loan losses was $132.6 million**. The Company had **four nonperforming loans with a carrying value of $7.7 million**, before related loan loss reserves of $5.1 million, compared to four loans with a carrying value of $24.2 million, before related loan loss reserves of $5.1 million at September 30, 2022.

191.    During a related earnings call, hosted by the Company on the same day (the "4Q22 Earnings Call"), Defendant Kaufman stated:

> **We have strategically built our platform to succeed in all cycles, as a result we believe we're extremely well positioned to continue to outperform in this economic downturn. We have been very cognizant over the last 18 months preparing for what we believe would be a very challenging recessionary environment. As a result, we have taken a patient and selective approach to new investment** and have been heavily focused on preserving and building up the strong liquidity position. This has allowed us to accumulate over $800 million of cash and

53

liquidity on hand, providing us with the unique ability to remain offensive and take advantage of the many opportunities that will exist in this recession to garner premium yields on our capital.

Turning now to our fourth quarter performance. As Paul will discuss in more detail, our quarterly financial results were once again remarkable. *We produced distributable earnings of $0.60 per share, which is well in excess of our current dividend, representing a payout ratio of around 67%. Our financial results also have continued to benefit greatly from rising interest rates, which has significantly increased the net interest income and on our floating rate loan book as well as earnings on our escrow balances*. And clearly, with our extremely low payout ratio and multiple predictable reoccurring income streams, we are uniquely positioned as one of the only companies in our space with a very sustainable, protected dividend even in a challenging environment.

*We continue to place a heavy focus on converting our multifamily bridge loans into Agency loans, which is a critical part of our business strategy*, and our Agency business is capital light and produces significant long-dated income streams. We had tremendous success in the fourth quarter recapturing over $500 million, or around half of our balance sheet runoff, into new Agency originations. *A key component to our success in this area is a unique opportunity that exists in today's markets given the inverted yield curve to garner premium yields on our capital by refinancing certain of our balance sheet loans into Agency product and provide mezzanine financing.*

\* \* \*

In our GSE/Agency business, we had a very strong fourth quarter, originating $1.5 billion of new loans. These numbers include a few large deals in December that were accelerated in order to close by year-end, resulting in a light start to 2023 with approximately $150 million of originations in January. However, *our pipeline remains strong, giving us confidence in our ability to produce similar volumes in 2023. Additionally, we have a strategic advantage in that we focus on the workforce housing part of the market and have a large multifamily balance sheet loan book that naturally feeds our Agency business*. In fact, we are one of the leading Agency lenders in the achievement of affordable housing goals, and as a result, we will continue to be viewed very favorably by the agencies. And again, this Agency business offers a premium value, and it requires limited capital and generates significant, long-dated, predictable income streams and produces significant annual cash flow.

192.    Also during the 4Q22 Earnings Call, Defendant Elenio stated:

[W]e had another exceptional quarter producing distributable earnings of $114 million or $0.60 per share. We also had a record year with distributable earnings of $2.23 per share in 2022, a 11% increase over our 2021 results. These results

translated into industry-high ROEs of approximately 18% in 2022, allowing us to increase our dividend 3x to an annual run rate of $1.50 a share, reflecting a dividend-to-earnings ratio of around 67% for the fourth quarter and 70% for the full year 2022.

* * *

Our overall net interest spreads in our core assets, excluding the $8 million of default interest we collected in the fourth quarter, increased to 2.11% this quarter compared to $2.08 last quarter, and our overall spot net interest spreads were up to 1.92% at December 31 from 1.82% at September 30, again, mostly due to the positive effect of rising rates on our floating rate loan book and higher spreads in our new originations. Lastly, we believe it's important to emphasize some of the significant advantages of our business model, which gives us comfort in our ability to continue to generate high-quality, long-dated recurring earnings in the future. One of these features is the continued growth we'll see in our net interest income spreads as rates rise in our floating rate loan book. In fact, all things remaining equal, a 50 basis point increase in rates, 20 basis points of which has already occurred since year-end, would produce approximately $0.05 a share annually in additional earnings.

193.    Later during the 4Q22 Earnings Call, JPMorgan analyst Richard Barry Shane asked the following question:

I apologize if this is redundant, as like many of my peers, bouncing around between calls this morning. Just want to talk a little bit about the migration between the Structured Business and the Agency business to the extent historically you've put loans on balance sheet, worked with borrowers to complete the projects and then securitized those or sold them to the agencies. I'm curious if you think in this environment, there is -- how that compares to other commercial mortgage REIT models where the ultimate takeout is in the private term markets as opposed to the government term markets.

194.    In response, Defendant Kaufman stated:

So as you know, ***our business model on every bridge loan we do is for an Agency takeout***. That's how we're built. That's how we're structured. That's how the economics of the firm really flows, and that's the value of our franchise. ***So each and every loan that's in our portfolio is underwritten accordingly***. So in this kind of yield environment, when you have an inverted yield curve, many of the borrowers have a decision to make. Do they pay higher interest costs when their caps burn off? Can they cash in their caps and use that as equity and recapitalize some of their assets? Go with a fixed rate? If you're floating rate individual, you're paying anywhere between low of 8% and a high of 9.5%. And you factor in the capital cost of cap costs, you may have a great opportunity to go into a 10-year

55

fixed rate.

And we were putting people into 10-year fixed rates in low 5s on an [ IL ] basis. And the savings are so considerable, and the stability is so significant that people are willing to come out of pocket with cash, lower their principal balance, and go into Agency debt. In certain of those circumstances, we layered on some pref and some mezz, which has been very accretive for us as well. So that's our business model. It works very, very well. Some borrowers like to ride it out, other borrowers are more conservative. So it's a whole mixture. But unlike our competitors, *our model is built in that manner. It's multifamily debt. It's Agency eligible. And that's one of the primary exits every time we do a loan.*

195.    Jason Sabshon, an analyst from KBW, then asked the following question:

We're starting to see a few cases of what looks like strategic defaults from borrowers in order to extract concessions from lenders since they know that lenders don't want a foreclosure on their hands. For example, Blackstone did this large multifamily deal in New York that said special servicing. And we know that Arbor's borrower relationships are unique and to be repeat borrowers, but can you comment on whether you're seeing this trend at all?

196.    In response, Defendant Kaufman stated:


It's definitely a trend in the market. And in a competitive lending environment, many lenders strip away certain structures on their loan. *And without those structures on the loan, if the asset value is close to the debt and the lenders don't want to take back those assets, it gives a lot of strategic advantage to the borrowers if they don't care about their profile. For us, we have a long history of originating loans, and we have tremendous structure on our loans within the industry.*

*We're treated a lot differently than other people because we're very prudent when we made these loans*, and the borrowers need to come work with us for a variety of reasons, one of them is the structure on loans, the second is the number of loans we do with particular borrowers, and the asset class itself. So it is very common in today's environment that if the borrowers don't want to support the loans, they're going to hand back their keys because they have no economic incentive. And if you're a Blackstone, it doesn't affect your reputation.

*In our case, it's just very, very different. We're involved – I'm involved every day with our borrowers. And they come to the table -- if they have to come to the table, and if they're willing to be reasonable, we've been able to work out good solutions. Keep in mind that we have a deep and seasoned asset management group, and we're well positioned*. And if we have to, we will take back an asset. We haven't had to do it, but we always have that skillset and capability, and take

back that asset, manage it, capitalize it, and continue with our remedies against those borrowers. We haven't been in that position. We've been well positioned. And so far, we've done extraordinarily well in working with our borrower base.

197.    Also during the 4Q22 Earnings Call, Crispin Elliot Love, an analyst from Piper

Sandler & Co., asked the following question:

On maintaining the dividend in the quarter, can you speak to the key reasons why the Board chose to do that after, I believe, 10 consecutive increases. Just on the surface, looking at your results, which are really strong with GAAP and core earnings [indiscernible] the dividend. It would have seemed like a dividend increase would make sense, but I'm just curious how the Board thinks about that. And does that say anything about the cautious outlook?

198.    In response, Defendant Elenio stated:

I think our view is, as you know, ***we have a lot of cushion and easily could have just done it again***. But we look at when you come into these markets, and we've been, as Ivan in his prepared remarks, ***we've been strategically looking over the last 18 months at what we think would be a challenging recession. We think our assets in our portfolio are in great shape. We're in the right asset class. We have a lot of structure***. We do a lot of deals with repeat borrowers.

Having said that, when you come into challenging environments, cash and liquidity is crucial. And we've been – we've done a great job of accumulating -- of really stockpiling a war chest of cash. And at this point, we just don't see a lot of value in increasing that dividend today. Now that may change. We may see where our earnings go, and we'll continue to evaluate it with the Board on a quarterly basis. But again, raising it 3 times this year, 10 of the last 11 quarters, and when I look at the peer group, there's, I think, only 1 peer group that actually -- 1 person in our peer group that actually raised their dividend -- it was nominal -- over the last 3 years. So we just feel like the credit isn't there at this point, and we'll continue to evaluate it.

199.    On April 27, 2023, Arbor filed a proxy statement on Form DEF 14A with the SEC

(the "2023 Proxy Statement"), soliciting shareholder approval for, *inter alia*, the re-election of

Defendants Kaufman and Lazar to serve for another three-year term on the Company's Board and

the compensation of certain of the Company's executive officers, including Defendants Kaufman

and Elenio.

200.    With respect to the Company's risk assessment and risk management functions, the

2023 Proxy Statement stated:

> The Audit Committee takes the lead for the Board in oversight of our risk management activities. At least quarterly, the Audit Committee receives a review of our investment portfolio and quarterly results from our CFO and an internal audit report and a Sarbanes-Oxley compliance report from our internal auditor, DLA, LLC. The review of our investment portfolio and quarterly results covers a wide range of topics and potential issues that could impact us, including matters such as investment performance, investment risks, counterparty risks of asset management activities and balance sheet, results of operations, key financial metrics and operational and integration risks. The internal audit plan is approved by the Audit Committee and regular reports on the progress and results of the internal audit program are provided to the Audit Committee. Our independent registered public accounting firm, Ernst & Young, provides the audit report. Aspects of these reports are presented to the full Board at least quarterly by either the Chairman of the Audit Committee or the member of management responsible for the given subject area. In addition, the entire Board of Directors receives reports from our General Counsel with respect to any legal or regulatory matters that could materially affect us. The Compensation Committee takes the lead for the Board in oversight of risk relating to compensation matters. The Compensation Committee considers, in establishing and reviewing our executive compensation program, whether the program encourages unnecessary risk taking and has concluded that it does not.

201.    With respect to Arbor's internal controls, the 2023 Proxy Statement states that the "Audit Committee . . . assists the Board in overseeing: [] the integrity of our financial statements . . . and [] our compliance with legal and regulatory requirements."

202.    The 2023 was materially false and misleading because it failed to disclose the truth with respect to the Company's inadequate underwriting and fraudulent accounting practices. Further, despite descriptions of the Board's and its committees' oversight responsibilities with respect to risk management, internal controls, and legal and regulatory compliance, the Board and its committees were not adequately fulfilling these responsibilities and were causing or permitting the Company to violate the federal securities laws and to issue the false and misleading statements detailed herein.

203.    On May 5, 2023, the Company filed a quarterly report on Form 10-Q with the SEC for the first fiscal quarter of 2023 (the "1Q23 10-Q"), which reported $102.2 million in quarterly

58

net income, compared to a net income of $79.9 million during the same period of the prior year.

The 1Q23 10-Q further reported net income attributable to common stockholders of $84.3 million, or $0.46 per diluted common share, compared to a net income of $64.1 million, or $0.40 per diluted common share during the same period of the prior year.

204.    With respect to the Company's "provision for credit losses (net of recoveries)," Arbor reported a $22.5 million provision for loan losses associated with CECL. With respect to the Company's "Allowance for Credit Losses," Arbor provided the following "summary of the changes in the allowance for credit losses . . . (in thousands)":

| | Land | Multifamily | Office | Retail | Commercial | Single-Family Rental | Other | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | **Three Months Ended March 31, 2023** | | | | |
| Allowance for credit losses: | | | | | | | | |
| Beginning balance | $ 78,068 | $ 37,961 | $ 8,162 | $ 5,819 | $ 1,700 | $ 781 | $ 68 | $ 132,559 |
| Provision for credit losses (net of recoveries) | 18 | 20,387 | (56) | — | — | 192 | (23) | 20,518 |
| Ending balance | $ 78,086 | $ 58,348 | $ 8,106 | $ 5,819 | $ 1,700 | $ 973 | $ 45 | $ 153,077 |

205.    The 1Q23 10-Q additionally included the following "summary of [Arbor's] non-performing loans by asset class . . . (in thousands)":

| | | March 31, 2023 | | | December 31, 2022 | |
|---|---|---|---|---|---|---|
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
| Multifamily | $ 2,605 | $ — | $ 2,605 | $ 2,605 | $ — | $ 2,605 |
| Retail | 3,445 | — | 3,445 | 3,445 | — | 3,445 |
| Commercial | 1,700 | — | 1,700 | 1,700 | — | 1,700 |
| Total | $ 7,750 | $ — | $ 7,750 | $ 7,750 | $ — | $ 7,750 |

206.    The 1Q23 10-Q further reported $122.2 million in distributable earnings, or $0.62 per diluted common share, compared to $92.9 million, or $0.55 per diluted common share during the same period of the prior year.

207.    In a section titled "Concentration of Credit Risk," the 1Q23 10-Q stated, in pertinent part:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and

a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

208.    The 1Q23 10-Q further provided the following "summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at March 31, 2023 . . . ($ in thousands)," including, *inter alia*, the "Multifamily" asset class:

| Asset Class / Risk Rating | UPB by Origination Year | | | | | | |
| | 2023 | 2022 | 2021 | 2020 | 2019 | Prior | Total |
|---|---|---|---|---|---|---|---|
| **Multifamily:** | | | | | | | |
| Pass | $ 22,360 | $ 549,835 | $ 268,328 | $ 3,155 | $ — | $ 20,300 | $ 863,978 |
| Pass/Watch | 160,465 | 2,781,244 | 3,236,800 | 303,109 | 203,354 | 22,050 | 6,707,022 |
| Special Mention | — | 1,322,873 | 2,884,543 | 51,175 | 51,785 | 27,194 | 4,337,570 |
| Substandard | — | 97,218 | 259,302 | — | 10,565 | 32,500 | 399,585 |
| Total Multifamily | $ 182,825 | $ 4,751,170 | $ 6,648,973 | $ 357,439 | $ 265,704 | $ 102,044 | $ 12,308,155 |

209.    The 1Q23 10-Q reported that the Company's weighted average Last Dollar LTV Ratio for its total multifamily asset class was 77%.

210.    Also on May 5, 2023, Arbor issued a press release titled "Arbor Realty Trust Reports First Quarter 2023 Results and Increases Dividend to $0.02 to $0.42 per Share" (the "1Q23 Release"). The 1Q23 Release was attached as an exhibit to a current report, filed with the SEC on Form 8-K.

211. The 1Q23 Release reported "GAAP net income of $0.46 per diluted share" and "distributable earnings of $0.52 per diluted common share, representing 68% payout ratio." The 1Q23 Release further stated:

> Arbor reported net income for the quarter of $84.3 million, or $0.46 per diluted common share, compared to net income of $64.1 million, or $0.40 per diluted common share for the quarter ended March 31, 2022. Distributable earnings for the quarter was $122.2 million, or $0.62 per diluted common share, compared to $92.9 million, or $0.55 per diluted common share for the quarter ended March 31, 2022.

212. The 1Q23 Release additionally reported:

> During the first quarter of 2023, the Company **recorded a $20.5 million provision for loan losses associated with CECL**. At March 31, 2023, the Company's **total allowance for loan losses was $153.1 million**. The Company had **four nonperforming loans with a carrying value of $7.7 million**, before related loan loss reserves of $5.1 million, which was unchanged from December 31, 2022.

213. During a related earnings call, hosted by the Company on the same day (the "1Q23 Earnings Call"), Defendant Elenio stated the following with respect to the Company's loan loss reserves:

> **We also recorded an additional $20 million in CECL reserves on our balance sheet loan book during the quarter as a result of using more conservative assumptions in our model due to a decline in the macroeconomic outlook for commercial real estate**. These reserves are general in nature and do not affect distributable earnings as we have not experienced any realized losses this quarter.
>
> **Our balance sheet loan book continues to perform well in this market with no increases in default or delinquencies in the first quarter**. And as Ivan mentioned earlier, **we believe we are well positioned given our multifamily focus**, strong liquidity position and our best-in-class dedicated asset management team with tremendous experience **giving us confidence in our ability to successfully manage through this cycle**.

214. During the question-and-answer portion of the 1Q23 Earnings Call, the following exchange occurred among Crispin Elliot Love ("Love"), an analyst from Piper Sandler & Co., and Defendants Elenio and Kaufman:

> **Love**

My first one is on credit. I'm just curious if you'd be able to share some of the underlying credit stats for the CLOs structured loan book and the Fannie loss share. I'm just curious how they're faring in expectations over the near to intermediate term?

**Defendant Elenio**

Yes, sure. So as you saw, Crispin, we were certainly more conservative this quarter with our CECL reserves. As you know, those CECL reserves don't really translate always into realized losses. So we've got some specific reserves against some balance sheet assets that we've had for a while, some legacy assets. ***We've not seen a significant amount of stress, a little bit of stress. We've had a little bit of a migration some loans from past watch to special mention.***

***But again, special mention is not a category that means to us that we're going to have a loss. So there's going to be a default imminent. It's just changes in where maybe values have gone or where interest rates have gone. So overall, I think the balance sheet book is holding up well in this market***. We do expect the market to be challenging over the next few quarter.

As Ivan said, we think the bottom is near, but it will take time to rebound, but it's been performing well. ***We've put some CECL reserves away. But we're not seeing really a lot of stress on the balance sheet side and on the CLO side as well***. On the Agency side, we do have as you know, loss share component with Fannie Mae. We saw a little bit of a tick up in delinquencies this quarter, but not significant and things move in and out all the time.

We've put a couple of million more in specific reserves on our books this quarter related to our agency book. But for the most part, things are pretty stable. ***We haven't seen a tremendous move negatively on the credit of either side of our portfolio, both the balance sheet or the Agency***. Ivan, would you say that's accurate?

**Defendant Kaufman**

Yes, I would say that's accurate. The one thing that we have seen, which is worth noting because I think it's a transitory and work itself out. We're still seeing in some of the jurisdictions, people having tough time affecting their tenants really, really long. You'd think with COVID, it's all behind us. It's not. ***So you're seeing economic occupancy a lot lower, which is putting a lot of stress on our borrowers because they don't have the income to support their debt service and they're coming out of pocket, which they should and they will.***

And that's causing some of our 30- and 60-day delinquencies on the agency side to pop up. We think that we're 50%, 60% [indiscernible] in the back end of that as the court systems are loosening up. But there are some jurisdictions who are just not moving quickly. And it's not fair to the landlords to allow tenants to stay in their property for years and not pay rent and not be able to evict them.

So that has caused a little bit of a tick up in delinquencies. Our borrowers are holding on. They're committed to their assets. They're struggling, but they're getting there. But I think the worst is over on that. I think that we will turn the corner on those kind of things, but people don't really talk about that, but we see it in fund center. We see it in certain specific geographic locations. And we see it if a borrower has 5 or 6 or 8 or 10 properties across his portfolio, he's dealing with that. ***And that will work itself out over time because the value is still in the real estate. The operator is a good real estate. They've dipped into a pocket of good deal and they're looking to solve those problems they're solvable over time, and we're working with a lot of these borrowers to get through some of those issues.***

215.    JPMorgan analyst Richard Barry Shane then asked the following question:

First of all, a topic we've been raising throughout earnings season is related to repurchases. And so I want to acknowledge the commitment to buying back shares in the context of what's going on in the market. That said, we've had a number of questions, and I think it's a very fair point related to interest rate caps and extensions on loans. If you guys could just walk through a little bit given the impact of higher rates on borrowers the magnitude or the coverage your borrowers have in terms of interest rate caps. And if you could provide some information in terms of the tenure of those caps versus the tenure of the fully extended structured portfolio?

216.    In response, Defendant Kaufman stated:

First of all, everything is on a case-to-case basis and what's unique about all that's relative to other lenders, which we compete a bit consistently, is ***we have a lot of structure on our loans, and it's just not making the real estate loan with no responsibility to the borrower. So in many cases, there's an obligation by the borrower to buy interest rate caps, to refund the interest and do things of that nature.***

It's been actually a great opportunity for us because 6 months ago, 9 months ago with the inverted yield curve, the cost of caps and the negative carry, we've had a lot of people say, okay, it doesn't really pay to pay 9% or 8% to buy cap and have negative carry and they've elected to actually pay down their loans and convert themselves into Agency loans, which in today's market, you can borrow between 4.75% and 5.5%. And that's been very, very, very effective for us.

We do monitor very closely any caps that are expiring and we work with the borrowers to either put new caps on or to figure out alternatives in order to make sure that they're in a good position. So there's no one specific answer to that because it's case by case. Management works at it very intensively. And I actually am very involved in that as well. So we deal with that. ***Many of our borrowers have multiple loans with us. And it's carefully crafted for each situation.***

217.    On July 28, 2023, the Company filed a quarterly report on Form 10-Q with the SEC for the second fiscal quarter of 2023 (the "2Q23 10-Q"), which reported $93.3 million in quarterly net income, compared to a net income of $88.1 million during the same period of the prior year. The 2Q23 10-Q further reported net income attributable to common stockholders of $76.2 million, or $0.41 per diluted common share, compared to a net income of $69.9 million, or $0.41 per diluted common share during the same period of the prior year.

218.    With respect to the Company's "provision for credit losses (net of recoveries)," Arbor reported a $13.9 million provision for loan losses associated with CECL. With respect to the Company's "Allowance for Credit Losses," Arbor provided the following "summary of the changes in the allowance for credit losses . . . (in thousands)":

| | Three Months Ended June 30, 2023 | | | | | | | |
| | Land | Multifamily | Office | Retail | Commercial | Single-Family Rental | Other | Total |
|---|---|---|---|---|---|---|---|---|
| Allowance for credit losses: | | | | | | | | |
| Beginning balance | $ 78,086 | $ 58,348 | $ 8,106 | $ 5,819 | $ 1,700 | $ 973 | $ 45 | $ 153,077 |
| Provision for credit losses (net of recoveries) | (184) | 15,947 | 140 | — | — | 104 | (30) | 15,977 |
| Ending balance | $ 77,902 | $ 74,295 | $ 8,246 | $ 5,819 | $ 1,700 | $ 1,077 | $ 15 | $ 169,054 |

219.    The 2Q23 10-Q additionally included the following "summary of [Arbor's] non-performing loans by asset class . . . (in thousands)":

| | June 30, 2023 | | | December 31, 2022 | | |
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
|---|---|---|---|---|---|---|
| Multifamily | $ 119,291 | $ 116,686 | $ 2,605 | $ 2,605 | $ — | $ 2,605 |
| Retail | 3,445 | — | 3,445 | 3,445 | — | 3,445 |
| Commercial | 1,700 | — | 1,700 | 1,700 | — | 1,700 |
| Total | $ 124,436 | $ 116,686 | $ 7,750 | $ 7,750 | $ — | $ 7,750 |

220.    The 2Q23 10-Q further reported $114.0 million in distributable earnings, or $0.57 per diluted common share, compared to $93.7 million, or $0.52 per diluted common share during the same period of the prior year.

221.    In a section titled "Concentration of Credit Risk," the 2Q23 10-Q stated, in pertinent part:

We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

222.    The 2Q23 10-Q further provided the following "summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at June 30, 2023 . . . ($ in thousands)," including, *inter alia*, the "Multifamily" asset class:

| Asset Class / Risk Rating | UPB by Origination Year | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2020 | 2019 | Prior | |
| Multifamily: | | | | | | | |
| Pass | $ 208,351 | $ 191,850 | $ 249,714 | $ 11,000 | $ — | $ 20,300 | $ 681,215 |
| Pass/Watch | 493,020 | 2,685,299 | 2,741,640 | 121,870 | 93,235 | 7,194 | 6,142,258 |
| Special Mention | — | 1,624,051 | 2,835,865 | 196,825 | 161,885 | 21,700 | 4,840,326 |
| Substandard | — | 171,821 | 237,737 | 24,100 | — | 52,450 | 486,108 |
| Doubtful | — | — | 2,605 | — | 9,765 | — | 12,370 |
| Total Multifamily | $ 701,371 | $ 4,673,021 | $ 6,067,561 | $ 353,795 | $ 264,885 | $ 101,644 | $ 12,162,277 |

223.    The 2Q23 10-Q reported that the Company's weighted average Last Dollar LTV Ratio for its total multifamily asset class was 77%.

224.    Also on July 28, 2023, Arbor issued a press release titled "Arbor Realty Trust Reports Second Quarter 2023 Results and Increases Quarterly Dividend to $0.43 per Share" (the

"2Q23 Release"). The 2Q23 Release was attached as an exhibit to a current report, filed with the SEC on Form 8-K.

225.    The 2Q23 Release reported "GAAP net income of $0.41 per diluted share" and "distributable earnings of $0.57 per diluted common share, well in excess of our current dividend, representing a 75% payout ratio." The 1Q21 Release further stated:

> Arbor reported net income for the quarter of $76.2 million, or $0.41 per diluted common share, compared to net income of $69.9 million, or $0.41 per diluted common share for the quarter ended June 30, 2022. Distributable earnings for the quarter was $114.0 million, or $0.57 per diluted common share, compared to $93.7 million, or $0.52 per diluted common share for the quarter ended June 30, 2022.

226.    The 2Q23 Release additionally reported:

> During the second quarter of 2023, the Company **recorded an $16.0 million provision for loan losses associated with CECL**. At June 30, 2023, the Company's **total allowance for loan losses was $169.1 million**. The Company **had seven nonperforming loans with a carrying value of $122.4 million**, before loan loss reserves of $10.1 million, compared to four loans with a carrying value of $7.7 million, before loan loss reserves of $5.1 million as of March 31, 2023.

227.    During a related earnings call, hosted by the Company on the same day (the "2Q23 Earnings Call"), Defendant Kaufman stated:

> **And despite being a very challenging environment over the last several quarters, we've managed to maintain our book value while we recorded reserves for potential future losses**, which clearly differentiates us from every one of our peers. As we've discussed many times, **we've been laser-focused over the last 2 years and preparing for what we felt would be a very challenging recessionary environment.**
>
> \* \* \*
>
> In fact, **unlike others in this space, we've been conducting ourselves as if we have been in a recession for over a year now**. And as a result, one of our primary focus has been and continues to be preserving and building up a strong liquidity position. We are very pleased to report that we currently have approximately $1 billion in cash, which gives us a tremendous amount of flexibility to manage through this downturn and provide us with the unique ability to take advantage of the opportunities that will exist in this environment to generate superior returns on our capital.

* * *

There continues to be a significant amount of volatility in the market and we are well aware of the challenges that lie ahead. We feel we are right in the thick of this dislocation and are operating our business with the expectation that the next 2 to 3 quarters will be the most challenging part of the cycle. As in the case with any real estate cycle, there will be issues and challenges to contend with, some of which will be a high touch and require tremendous amount of discipline and expertise.

* * *

***We are extremely well positioned compared to our peers given our multifamily-centric portfolio***, our asset management skills and tenured senior management experience with a track record of managing through multiple cycles ***and the strength of our balance sheet and versatility of our franchise.***

* * *

***In our balance sheet lending business, we remain very selective, focusing mainly on converting on multifamily bridge loans into agency product, allowing us to recapture a substantial amount of our invested capital and produce significant long-dated income streams***. In the second quarter, we continued to have success in **this area with another $685 million of balance sheet runoff, $435 million or 64%, which was recaptured into new agency loan originations. As a result, we're able to recoup $125 million of capital and continue to build out our cash position, which again currently sits at approximately $1 billion.**

* * *

In our GSE/Agency business, we had an exceptionally strong second quarter, originating $1.4 billion of loans, and our pipeline remains elevated. Clearly, with the continued inverted yield curve, the agencies are effectively the only game in town, which gives us confidence in our ability to continue to produce strong origination volumes for the balance of the year.

* * *

***We also have a strategic advantage in that we*** focus on the workforce housing part of the market and of ***a large multifamily balance sheet book with -- that naturally feeds our Agency business***. And again, this Agency business offers a premium value as it requires limited capital and generates significant long-dated predictable income streams and produces significant annual cash flow.

228.    Later during the 2Q23 Earnings Call, Steven Cole Delaney, an analyst from JMP

Securities LLC, asked the following question: "Yes. I mean the geo sounds good. Is it an interest

rate problem? I mean is people just behind there? Is it cash flow or just leasing problem?" In response, Defendant Kaufman stated the following:

> Let me give a little bit of a view on it. I think generally, in particular with the assets we're talking about is you often have underperforming sponsors. The underperforming sponsors, it catches up to them a little bit. So when you see stress in the portfolio like we're seeing, it's a fact that the sponsors are not executing along their plan. And that's one part.

> * * *

> The second part is that we are in the cycle a long period of time and these elevated interest rates do put stress on these assets. The rates are up anywhere between 10% to 100%, so they run into payment issues and often they're late in the payment, trying to raise additional capital and try and get them in a proper position. But what we're seeing most of all with a stress on some of these loans, a lot of it is execution.

> * * *

> I mean there are other factors as well: elevated interest rates, increased insurance costs and increased taxes and increased labor costs. So it's a combination of all. But generally, if you have good operators, they're able to manage effectively. The poor operator catches up with them a little bit.

229.    On October 27, 2023, Arbor filed a quarterly report on Form 10-Q with the SEC for the third fiscal quarter of 2023 (the "3Q23 10-Q"), which reported $95.1 million in quarterly net income, compared to a net income of $79.1 million during the same period of the prior year. The 3Q23 10-Q further reported net income attributable to common stockholders of $77.9 million, or $0.41 per diluted common share, compared to a net income of $62.7 million, or $0.36 per diluted common share during the same period of the prior year.

230.    With respect to the Company's "provision for credit losses (net of recoveries)," Arbor reported a $18.7 million provision for loan losses associated with CECL. With respect to the Company's "Allowance for Credit Losses," Arbor provided the following "summary of the

| | Three Months Ended September 30, 2023 | | | | | | | |
| | Multifamily | Land | Office | Retail | Commercial | Single-Family Rental | Other | Total |
|---|---|---|---|---|---|---|---|---|
| Allowance for credit losses: | | | | | | | | |
| Beginning balance | $ 74,295 | $ 77,902 | $ 8,246 | $ 5,819 | $ 1,700 | $ 1,077 | $ 15 | $ 169,054 |
| Provision for credit losses (net of recoveries) | 14,884 | 60 | (76) | — | — | 162 | (15) | 15,015 |
| Ending balance | $ 89,179 | $ 77,962 | $ 8,170 | $ 5,819 | $ 1,700 | $ 1,239 | $ — | $ 184,069 |

changes in the allowance for credit losses . . . (in thousands)":

231.    The 3Q23 10-Q additionally included the following "summary of [Arbor's] non-performing loans by asset class . . . (in thousands)":

| | September 30, 2023 | | | December 31, 2022 | | |
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
|---|---|---|---|---|---|---|
| Multifamily | $ 152,717 | $ 122,847 | $ 29,870 | $ 2,605 | $ — | $ 2,605 |
| Retail | 3,445 | — | 3,445 | 3,445 | — | 3,445 |
| Commercial | 1,700 | — | 1,700 | 1,700 | — | 1,700 |
| Total | $ 157,862 | $ 122,847 | $ 35,015 | $ 7,750 | $ — | $ 7,750 |

232.    The 3Q23 10-Q further reported $112.2 million in distributable earnings, or $0.55 per diluted common share, compared to $105.1 million, or $0.56 per diluted common share during the same period of the prior year.

233.    In a section titled "Concentration of Credit Risk," the 3Q23 10-Q stated, in pertinent part:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

> Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating

matter.

234.    The 3Q23 10-Q further provided the following "summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at September 30, 2023 . . . ($ in thousands)," including, *inter alia*, the "Multifamily" asset class:

| Asset Class / Risk Rating | UPB by Origination Year | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2020 | 2019 | Prior | |
| Multifamily: | | | | | | | |
| Pass | $ 97,186 | $ 131,266 | $ 97,269 | $ 2,010 | $ — | $ 20,300 | $ 348,031 |
| Pass/Watch | 673,165 | 2,378,519 | 3,015,502 | 81,560 | 112,416 | 58,394 | 6,319,556 |
| Special Mention | 799 | 1,830,803 | 2,353,938 | 219,050 | 140,685 | — | 4,545,275 |
| Substandard | — | 290,492 | 153,697 | 24,099 | — | — | 468,288 |
| Doubtful | — | — | 13,930 | — | 9,765 | — | 23,695 |
| Total Multifamily | $ 771,150 | $ 4,631,080 | $ 5,634,336 | $ 326,719 | $ 262,866 | $ 78,694 | $ 11,704,845 |

235.    The 3Q23 10-Q reported that the Company's weighted average Last Dollar LTV Ratio for its total multifamily asset class was 78%.

236.    Also on October 27, 2023, the Company issued a press release titled "Arbor Realty Trust Reports Third Quarter 2023 Results and Declares Dividend of $0.43 per Share" ("3Q23 Release"). The 3Q23 Release was attached as an exhibit to a current report, filed with the SEC on Form 8-K.

237.    The 3Q23 Release reported "GAAP net income of $0.41 per diluted share" and "distributable earnings of $0.55 per diluted common share, well in excess of our current dividend, representing a 78% payout ratio." The 3Q23 Release further stated:

Arbor reported net income for the quarter of $77.9 million, or $0.41 per diluted common share, compared to net income of $62.7 million, or $0.36 per diluted common share for the quarter ended September 30, 2022. Distributable earnings for the quarter was $112.2 million, or $0.55 per diluted common share, compared to $105.1 million, or $0.56 per diluted common share for the quarter ended September 30, 2022.

238.    The 3Q23 Release additionally reported:

During the third quarter of 2023, the Company *recorded a $15.0 million provision for loan losses associated with CECL*. At September 30, 2023, the Company's *total allowance for loan losses was $184.1 million*. The Company had *twelve nonperforming loans with a carrying value of $137.9 million*, before related loan loss reserves of $12.6 million, compared to seven loans with a carrying value of

$122.4 million, before loan loss reserves of $10.1 million at June 30, 2023.

239.    During a related earnings call, hosted by the Company on the same day (the "3Q23 Earnings Call"), the following exchange occurred among Defendant Kaufman, Raymond James & Associates Inc. analyst Stephen Albert Laws, and Wedbush Securities Inc. analyst Jay McCanless:

> Additionally and very significantly despite being in a very challenging environment over the last several quarters, *we've managed to maintain our book value while reporting reserves with potential future losses*, which clearly differentiates us from every one of our peers.

> * * *

> In fact, we are one of the only companies in our space who have experienced significant book value appreciation over the last 3 years with roughly 40% growth from around $9 a share to nearly $13 a share. As we discussed on our last call, we feel we are right in the thick of this dislocation. Operating our business with the expectation that the next 2 or 3 quarters will be the most challenging part of this cycle. *We have been laser focused over the last 2 years preparing for this environment*. One of our primary focuses has been and continues to be preserving and building up a strong liquidity position.

> * * *

> This is an extremely challenging environment, and I'm very pleased with the level of success we've had to date in managing through this downturn, which is a real testament to the quality of our franchise and the extraordinary efforts being put forth by our entire organization. As we have said before, we feel *we are very well positioned compared to our peers given our strong liquidity position, multifamily-centric portfolio*, the depth and skill of our management team *and the strength of our balance sheet* and the versatility of franchise. We also believe we are uniquely positioned to step back into the lending market and done some very accretive opportunities to continue to grow our platform. While others in the space will be dealing with significant internal issues, we feel we are well positioned which allows us to reenter the lending market at a time when there was a great opportunity to put some of the high-quality loans with attractive returns while the competition is less active.

> * * *

> We're also the only company in this space that has been able to consistently grow our dividend with approximately 40% growth over the last 3 years, all while maintaining the lowest dividend payout ratio in the industry. Just as importantly, in a time of tremendous test, *we've managed to maintain a book value of our*

***according reserves for future losses,*** which clearly differentiates us from our peers. And we believe our diverse business model uniquely positions us as one of the only companies in the space with the ability to preserve our book value and continue to provide a very stable protected dividend even in this extremely challenging environment.

\* \* \*

***In our balance sheet lending business, we remain focused on converting on multifamily bridge loans into agency product allow us to recapture a substantial amount of our invested capital and produce significant long-dated constraints***. In the third quarter, we continued to have success in this area with another $665 million of balance sheet runoff, $350 million or 53%, which was captured into new agency loan originations. As a result, we're able to recoup approximately $100 million of capital and continue to build up our cash position, which again currently sits at around $1 billion. And again, we're excited about the opportunities. We think we'll be -- available to us over the next 3 to 6 months to reenter the market, grow our balance sheet loan book and generate very attractive returns on our capital while continuing to build up our pipeline for future Agency Business.

\* \* \*

**Stephen Albert Laws**

Congrats on the solid quarter in a very difficult environment. Ivan, I wanted to start, can we talk about -- you mentioned the next 2 to 3 quarters being most challenging. I know you said something similar to last quarter. When you look at the fourth quarter '21 origination volume, you had a pretty big quarter. 2-year loans would be hitting original maturity dates next quarter. So can you talk about how many of those have caps that might expire given this outlook increased since the last quarter, how does that impact your expected stress you think you may see in the next couple of months given where rates are? And maybe at a more detailed level, how many of those borrowers do you think are on track with their business plan? How many need more time versus how many have a real cap rate issue around the rate move?

\* \* \*

**Defendant Kaufman**

Yes. Most of our loans are 3-year loans with extensions, it's not 2-year loans. Just a correction on that comment. ***It's an ongoing process. We don't wait until the expiration of a rate cap or we don't wait for loans. People have come to us, we're very proactive***. I think the biggest risks other than the rate cap which is a true risk, and that's just an economic issue because, of course, the new rate cap as a state dollar amount. For us, the real concern is performance and making sure that the assets are being managed. A lot of the bridge assets required execution to get to their business plan. There was a lot of upside in the rents and unit turns and getting them to market.

\* \* \*

*And I think, if anything, is what we see in the industry is the lack of execution, which creates an economic risk for the borrowers and not getting to their numbers. So we're putting a lot of time and attention to managing these assets, staying on top of the bars, working with them to change management companies and recapitalize their deals well ahead of time. So it's an ongoing process. It's not get to the cliff and deal with it then.*

**Jay McCanless**
The first question I had, if rates stay at these levels or even higher into '24 and '25, could you talk about what you think could potentially happen with the loan book?

**Defendant Kaufman**
Yes. I mean rates are clearly at a very elevated level, and it's put a lot of stress on people being able to exit into the fixed rate market when rates were in the 3s. It was already stressful and borrowers, and *we were encouraging borrowers to convert.*

*The short-term rates have gone up a little bit, but they're maintaining it at these* levels. Clearly, it's an elevated stress level. We're thinking we're going to stay at these levels for the next three quarters and are planning accordingly. But make no mistake about it. That's distress in the system.

\* \* \*

People, when they have their business plan, they exit to a fixed rate, and it was anticipated in their minds the tenure would be around 3, [ 3.50 ]. Now it's getting close to 5 sort of opportunity to exit is much more difficult. ***So they've got to bring more capital to the table or bring more capital to able to carry their assets. That's as simple as it is, and that's just stressing the [asset].***

240.    On February 20, 2024, the Company filed its 2023 annual report on Form 10-K with the SEC (the "2023 10-K"), which was signed by Defendants Kaufman, Elenio, Bacon, Effron, Farrell, Green, Lazar, Martello, and Schwartz. The 2023 10-K reported $400.6 million in net income for the year, up from $353.8 million during the prior year. The 2023 10-K further reported net income attributable to attributable to common stockholders of $330.1 million, compared to a net income of $224.8 million during the prior year. The 2023 10-K additionally reported a $73.4 million provision for loan losses associated with CECL, compared to a provision of $21.1 million the prior year.

241.    With respect to the Company's "Allowance for Credit Losses," Arbor provided the following "summary of the changes in the allowance for credit losses . . . (in thousands)":

| | Multifamily | Land | Retail | Commercial | Single-Family Rental | Office | Other | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | Year Ended December 31, 2023 | | | | |
| Allowance for credit losses: | | | | | | | | |
| Beginning balance | $ 37,961 | $ 78,068 | $ 5,819 | $ 1,700 | $ 780 | $ 8,162 | $ 69 | $ 132,559 |
| Provision for credit losses (net of recoveries) | 72,886 | (10) | (2,526) | — | 844 | (2,320) | (69) | 68,805 |
| Charge-offs | — | — | — | — | — | (5,700) | — | (5,700) |
| Ending balance | $ 110,847 | $ 78,058 | $ 3,293 | $ 1,700 | $ 1,624 | $ 142 | $ — | $ 195,664 |

242.    The 2023 10-K further reported $452.5 million in distributable earnings, or $2.25 per diluted common share, compared to $405.7 million, or $2.23 per diluted common share during the prior year.

243.    The 2023 10-K additionally included the following "summary of [Arbor's] non-performing loans by asset class . . . (in thousands)":

| | December 31, 2023 | | | December 31, 2022 | | |
|---|---|---|---|---|---|---|
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
| Multifamily | $ 271,532 | $          — | $ 271,532 | $ 2,605 | $          — | $ 2,605 |
| Commercial | 1,700 | — | 1,700 | 1,700 | — | 1,700 |
| Retail | 920 | — | 920 | 3,445 | — | 3,445 |
| Total | $ 274,152 | $          — | $ 274,152 | $ 7,750 | $          — | $ 7,750 |

244.    The 2023 10-K further stated:

In this challenging economic environment, we have recently experienced late and partial payments on certain loans in our structured portfolio. At December 31, 2023, these loans included twenty-four multifamily bridge loans with an aggregate UPB of $956.9 million that were 60 days or less past due. We are recognizing income on these loans to the extent cash is received. These loans include one specifically reserved loan with a $3.0 million loan loss reserve and a UPB of $32.6 million.

245.    In a section titled "Concentration of Credit Risk," the 2023 10-K stated, in pertinent part:

We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may

result in a rating that is higher or lower than might be indicated by any risk rating matrix.

246.    The 2023 10-K further provided the following "summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at December 31, 2023 . . . ($ in thousands)," including, *inter alia*, the "Multifamily" asset class:

| Asset Class / Risk Rating | UPB by Origination Year | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2020 | 2019 | Prior | |
| Multifamily: | | | | | | | |
| Pass | $ 80,814 | $ 53,316 | $ 26,185 | $ 2,010 | $ 4,598 | $ 20,300 | $ 187,223 |
| Pass/Watch | 317,358 | 2,561,938 | 2,223,155 | 119,860 | 84,600 | 58,044 | 5,364,955 |
| Special Mention | 24,424 | 1,762,539 | 2,631,689 | 180,750 | 140,685 | 350 | 4,740,437 |
| Substandard | — | 435,878 | 322,987 | 8,006 | — | — | 766,871 |
| Doubtful | — | — | 13,930 | 14,800 | 9,765 | — | 38,495 |
| Total Multifamily | $ 422,596 | $ 4,813,671 | $ 5,217,946 | $ 325,426 | $ 239,648 | $ 78,694 | $11,097,981 |

247.    The 2023 10-K reported that the Company's weighted average Last Dollar LTV Ratio for its total multifamily asset class was 80%.

248.    The 2023 10-K included the following misleading risk disclosures:

***Risks Related to Our Financing and Hedging Activities***. We finance a significant amount of our loans and investments through a variety of means, including CLOs, securitizations, credit facilities, equity capital, senior and convertible debt instruments, and other structured financings. These vehicles may contain restrictive covenants and may require us to provide additional collateral or repurchase assets if the value of pledged assets, some of which we guarantee, decline in value. If we are unable to acquire eligible investments, find suitable replacement investments and access financing sources on favorable terms, or at all, we may not be able to obtain the level of leverage necessary to optimize our return on investment and cash available for distribution to our stockholders may decline.

\* \* \*

***Loan repayments are less likely in a volatile market environment***. Loan repayments are a significant source of liquidity for us. If borrowers are unable to refinance loans at maturity, the loans could go into default and the liquidity that we expect to receive from such repayments may not be available. Further, in the event the commercial real estate finance market deteriorates, borrowers that have extension rights will be more likely to exercise such rights, which will further delay our ability to access liquidity through repayments.

\* \* \*

***We may be unable to invest excess capital on acceptable terms, or at all, which would adversely affect our operating results***. We may not be able to identify investments that meet our investment criteria and we may not be successful in closing the investments that we do identify. In addition, the investments that we fund with our capital may not produce a satisfactory return on capital, which would adversely affect our operating results.

\* \* \*

***Volatility in values of multifamily and commercial properties may adversely affect our loans and investments***      In the event a property's net operating income decreases, a borrower may have difficulty repaying our loan, which could result in losses to us. In addition, decreases in property values reduce the value of the collateral and the potential proceeds available to a borrower to repay our loans, which could negatively impact our operating results.

\* \* \*

Commercial mortgage assets may be viewed as exposing an investor to greater risk of loss than residential mortgage assets since such assets are typically secured by larger loans to fewer obligors than residential mortgage assets. Multifamily and commercial property values, net operating income derived from such properties, and borrowers' credit ratings are subject to volatility and ***may be*** negatively affected by a number of factors, including, but not limited to, events such as natural disasters and pandemics, acts of war, terrorism, local economic and/or real estate conditions (such as industry slowdowns, oversupply of real estate space, occupancy rates, construction delays and costs) and other macroeconomic factors beyond our control. The performance and value of our loan and investment and servicing portfolios depend on the borrowers' ability to operate the properties that serve as collateral so that they produce adequate cash flow to pay their loans. ***We attempt to mitigate these risks through our underwriting and asset management processes. Our asset management team reviews our portfolios consistently and is in regular contact with borrowers to monitor the performance of the collateral and enforce our rights as necessary.***

249.    With respect to rising interest rates, the 2023 10-K stated that "rising interest rates will positively impact our net interest income since our structured loan portfolio exceeds our corresponding debt balances and the vast majority of our loan portfolio is floating-rate based on SOFR or LIBOR."

250.    With respect to Arbor's "Real Estate Values and Credit Risk," the 2023 10-K provided:

Commercial mortgage assets may be viewed as exposing an investor to greater risk of loss than residential mortgage assets since such assets are typically secured by larger loans to fewer obligors than residential mortgage assets. Multifamily and commercial property values, net operating income derived from such properties, and borrowers' credit ratings are subject to volatility and *may be* negatively affected by a number of factors, including, but not limited to, events such as natural disasters and pandemics, acts of war, terrorism, local economic and/or real estate conditions (such as industry slowdowns, oversupply of real estate space, occupancy rates, construction delays and costs) and other macroeconomic factors beyond our control. The performance and value of our loan and investment and servicing portfolios depend on the borrowers' ability to operate the properties that serve as collateral so that they produce adequate cash flow to pay their loans. *We attempt to mitigate these risks through our underwriting and asset management processes. Our asset management team reviews our portfolios consistently and is in regular contact with borrowers to monitor the performance of the collateral and enforce our rights as necessary.*

251.    Also on February 20, 2024, Arbor issued a press release titled "Arbor Realty Trust Reports Fourth Quarter and Full Year 2023 Results and Declares Dividend of $0.43 per Share" (the "4Q23 Release"). The 4Q23 Release was attached as an exhibit to a current report, filed with the SEC on Form 8-K.

252.    The 4Q23 Release reported "GAAP net income of $0.48" and "distributable earnings of $0.51, or $0.54 per diluted common share excluding a $7.0 million realized loss on an office property that was previously reserved for." The 4Q23 Release further stated:

Arbor reported net income for the quarter of $91.7 million, or $0.48 per diluted common share, compared to net income of $88.2 million, or $0.49 per diluted common share for the quarter ended December 31, 2022. Net income for the year was $330.1 million, or $1.75 per diluted common share, compared to $284.8 million, or $1.67 per diluted common share for the year ended December 31, 2022. Distributable earnings for the quarter was $104.1 million, or $0.51 per diluted common share, compared to $114.0 million, or $0.60 per diluted common share for the quarter ended December 31, 2022. Distributable earnings for the year was $452.5 million, or $2.25 per diluted common share, compared to $405.7 million, or $2.23 per diluted common share for the year ended December 31, 2022.

253.    The 4Q23 Release additionally reported:

During the fourth quarter of 2023, the Company *recorded a $17.3 million provision*

*for loan losses associated with CECL*, which was net of $4.8 million of loan loss recoveries. At December 31, 2023, the Company's ***total allowance for loan losses was $195.7 million***. The Company had ***sixteen non-performing loans with a carrying value of $262.7 million***, before related loan loss reserves of $27.1 million, compared to twelve loans with a carrying value of $150.5 million, before loan loss reserves of $12.6 million at September 30, 2023.

254.    During a related earnings call, hosted by Arbor on the same day (the "4Q23 Earnings Call"), Defendant Kaufman stated:

> Additionally and very significantly, we're able to maintain our book value of our recording reserves for potential future losses, which clearly differentiates us from everyone in the space. In fact, as Paul will discuss in more detail later, ***we generated GAAP earnings in excess of our dividend in 2023 despite recording approximately $90 million reserves*** and our distributable earnings were also well in excess of our dividend, providing one of the best dividend coverages ratios in the industry.

* * *

> On our last call, we gave guidance at the fourth quarter of last year and the first quarter and second quarter of this year would be the most challenging part of the cycle. We are in a period of peak stress and expect the next 2 quarters to be challenging, if not more challenging than the fourth quarter. As a result of this environment, we are experiencing elevated delinquencies. ***One of the many reasons this is occurring is certain borrowers are taking the position that they will default first and negotiate second, which is not a strategy that works well with us.***

* * *

> ***Second, borrowers need to bring capital to the table to rightsize their deals and raising capital is a lengthy process in today's climate. Therefore, you will see defaults rise initially until able to raise additional capital and then deals will often be recapped.***

255.    On April 18, 2024, Arbor filed a proxy statement on Form DEF 14A with the SEC (the "2024 Proxy Statement"), soliciting shareholder approval for, *inter alia*, the re-election of, *inter alia,* Defendants Bacon, Green, and Schwartz to serve for another three-year term on the Company's Board and the compensation of certain of the Company's executive officers, including Defendants Kaufman and Elenio.

256.    With respect to the Company's risk assessment and risk management functions, the

2024 Proxy Statement stated:

> The Audit Committee takes the lead for the Board in oversight of our risk management activities. At least quarterly, the Audit Committee receives a review of our investment portfolio and quarterly results from our CFO and an internal audit report and a Sarbanes-Oxley compliance report from our internal auditor, DLA, LLC. The review of our investment portfolio and quarterly results covers a wide range of topics and potential issues that could impact us, including matters such as investment performance, investment risks, counterparty risks of asset management activities and balance sheet, results of operations, key financial metrics and operational and integration risks. The internal audit plan is approved by the Audit Committee and regular reports on the progress and results of the internal audit program are provided to the Audit Committee. Our independent registered public accounting firm, Ernst & Young, provides the audit report. Aspects of these reports are presented to the full Board at least quarterly by either the Chairman of the Audit Committee or the member of management responsible for the given subject area. In addition, the entire Board of Directors receives reports from our General Counsel with respect to any legal or regulatory matters that could materially affect us. The Audit Committee oversees the Company's information security program that institutes and maintains controls for the systems, applications, and databases of the Company and of its third-party providers. To more effectively prevent, detect and respond to information security threats, the Company maintains a robust cybersecurity program, which is supervised by the Chief Technology Officer whose team is responsible for leading enterprise-wide cybersecurity strategy, policy, standards, and processes. The Information Technology team is supported by the Cyber Incident Response Team ("IRT"), which is comprised of technology staff, and members of the Company's Legal Department. The Audit Committee receives biannual reports from the IRT, as presented by the Chief Technology and General Counsel, on, among other things, the Company's cyber risks and threats, the status of projects to strengthen the Company's information security systems, assessments of the Company's security program and the emerging threat landscape. The Audit Committee regularly reports on these matters to the Board of Directors. The Compensation Committee takes the lead for the Board in oversight of risk relating to compensation matters. The Compensation Committee considers, in establishing and reviewing our executive compensation program, whether the program encourages unnecessary risk taking and has concluded that it does not.

257.    With respect to Arbor's internal controls, the 2024 Proxy Statement states that the

"Audit Committee . . . assists the Board in overseeing: [] the integrity of our financial statements .

. . and [] our compliance with legal and regulatory requirements."

258.    On May 3, 2024, the Company filed a quarterly report on Form 10-Q with the SEC

for the first fiscal quarter of 2024 (the "1Q24 10-Q"), which reported $73.2 million in quarterly net income, compared to a net income of $102.2 million during the same period of the prior year. The 1Q24 10-Q further reported net income attributable to common stockholders of $57.9 million, or $0.31 per diluted common share, compared to a net income of $84.3 million, or $0.46 per diluted common share during the same period of the prior year.

259.    With respect to the Company's "provision for credit losses (net of recoveries)," Arbor reported a $19.1 million provision for loan losses associated with CECL. With respect to the Company's "Allowance for Credit Losses," Arbor provided the following "summary of the changes in the allowance for credit losses . . . (in thousands)":

| | Three Months Ended March 31, 2024 | | | | | | | |
| | Multifamily | Land | Retail | Single-Family Rental | Commercial | Office | Other | Total |
|---|---|---|---|---|---|---|---|---|
| Allowance for credit losses: | | | | | | | | |
| Beginning balance | $ 110,847 | $ 78,058 | $ 3,293 | $ 1,624 | $ 1,700 | $ 142 | $ — | $ 195,664 |
| Provision for credit losses (net of recoveries) | 16,652 | 62 | — | 1,113 | — | (49) | — | 17,778 |
| Charge-offs | (1,500) | — | — | — | — | — | — | (1,500) |
| Ending balance | $ 125,999 | $ 78,120 | $ 3,293 | $ 2,737 | $ 1,700 | $ 93 | $ — | $ 211,942 |

260.    The 1Q24 10-Q additionally included the following "summary of [Arbor's] non-performing loans by asset class . . . (in thousands)":

| | March 31, 2024 | | | December 31, 2023 | | |
| | UPB | 61 - 90 Days Past Due | Greater Than 90 Days Past Due | UPB | 61 - 90 Days Past Due | Greater Than 90 Days Past Due |
|---|---|---|---|---|---|---|
| Multifamily | $ 462,207 | $ — | $ 462,207 | $ 271,532 | $ — | $ 271,532 |
| Commercial | 1,700 | — | 1,700 | 1,700 | — | 1,700 |
| Retail | 920 | — | 920 | 920 | — | 920 |
| Total | $ 464,827 | $ — | $ 464,827 | $ 274,152 | $ — | $ 274,152 |

261.    The 1Q24 10-Q further reported $96.7 million in distributable earnings, or $0.47 per diluted common share, compared to $122.2 million, or $0.62 per diluted common share during the same period of the prior year.

262.    With respect to "Other Non-accrued Loans," the 1Q24 10-Q reported:

In this challenging economic environment, we have recently experienced late and partial payments on certain loans in our structured portfolio. At March 31, 2024 and December 31, 2023, these loans included twelve and twenty-four multifamily bridge loans with a total UPB of $489.4 million and $956.9 million, respectively,

that were 60 days or less past due. We are recognizing income on these loans only to the extent cash is received. This decrease was due to $174.9 million of loans progressing to greater than 60 days past due and $712.9 million of loans that were modified and are now performing in accordance with the terms of their modifications, including bringing the loans current by paying past due interest owed … partially offset by an additional $420.3 million of loans in the first quarter of 2024 that are now less than 60 days past due and are recently experiencing late and partial payments.

263.    In a section titled "Concentration of Credit Risk," the 1Q24 10-Q stated, in pertinent part:

We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

264.    The 1Q24 10-Q further provided the following "summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at March 31, 2024 . . . ($ in thousands)," including, *inter alia*, the "Multifamily" asset class:

| Asset Class / Risk Rating | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2021 | 2020 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $ 36,060 | $ 92,062 | $ 52,027 | $ 8,835 | $ 2,010 | $ 24,879 | $ 215,873 |
| Pass/Watch | 36,501 | 319,437 | 2,336,702 | 1,846,835 | 119,860 | 113,100 | 4,772,435 |
| Special Mention | 9,069 | 3,014 | 1,771,071 | 2,787,716 | 28,250 | 167,229 | 4,766,349 |
| Substandard | — | 21,100 | 467,123 | 151,612 | 8,006 | 350 | 648,191 |
| Doubtful | — | — | 4,800 | 174,235 | 14,800 | 9,765 | 203,600 |
| Total Multifamily | $ 81,630 | $ 435,613 | $ 4,631,723 | $ 4,969,233 | $ 172,926 | $ 315,323 | 10,606,448 |

265. The 1Q24 10-Q reported that the Company's weighted average Last Dollar LTV Ratio for its total multifamily asset class was 84%.

266. Also on May 3, 2024, Arbor issued a press release titled "Arbor Realty Trust Reports First Quarter 2024 Results and Declares Dividend of $0.43 per Share" (the "1Q24 Release"). The 1Q24 Release was attached as an exhibit to a current report, filed with the SEC on Form 8-K.

267. The 1Q24 Release reported "GAAP net income of $0.31 per diluted share" and "distributable earnings of $0.47 or $0.48 per diluted common share, excluding a $1.6 million realized loss on non-performing loan that was previously reserved for." The 1Q24 Release further stated:

> Arbor reported net income for the quarter of $57.9 million, or $0.31 per diluted common share, compared to net income of $84.3 million, or $0.46 per diluted common share for the quarter ended March 31, 2023. Distributable earnings for the quarter was $96.7 million, or $0.47 per diluted common share, compared to $122.2 million, or $0.62 per diluted common share for the quarter ended March 31, 2023.

268. The 1Q24 Release additionally reported:

> During the first quarter of 2024, the Company *recorded a $17.8 million provision for loan losses associated with CECL*. At March 31, 2024, the Company's *total allowance for loan losses was $211.9 million*. The Company had *twenty-one nonperforming loans with a UPB of $464.8 million,* before related loan loss reserves of $32.9 million, compared to sixteen loans with a carrying value of $274.2 million, before loan loss reserves of $27.1 million at December 31, 2023.

269. During a related earnings call, hosted by the Company on the same day (the "1Q24 Earnings Call"), when discussing $1.9 billion in loan modifications completed by Arbor,

Defendant Kaufman stated that "*[t]he short-term nature of having a delinquent loan will not impact our decision-making process to achieve the correct economic result on the transaction.*"

270.    Defendant Kaufman continued, stating:

We have also been highly effective in refinancing deals through our agency business as well as ***leveraging our long-term standing relationships from many quality sponsors to step in to take over assets that are underperforming and assume our debt.*** This is a difficult and complicated work in an extremely challenging environment. And I can't tell you enough about the efforts put forth by our entire organization and successfully managing through the teeth of this dislocation.

271.    With respect to Arbor's Agency business, Defendant Kaufman stated that, "***Despite the current rate environment, we continue to maintain a large pipeline and we are not seeing significant fallout in this market, rather deals are just being pushed out further***" and highlighted that "***we have also done a great job in converting our balance sheet loans into agency product.***"

272.    During the 1Q24 Earnings Call, Defendant Elenio stated the following with respect to Arbor's delinquent or non-performing loans:

Our nonperforming loan numbers are now $465 million this quarter, due to approximately $175 million of loans progressing from less than 60 days delinquent to greater than 60 days past due and roughly $15 million of net new additions for the quarter. The less than 60 days past due loans or our nonaccrual loans came down to $489 million this quarter, mostly due to $713 million of loans being successfully modified as I mentioned earlier, combined with $175 million of loans moving to 60-plus days delinquent, which was partially offset by approximately $420 million of new loans this quarter that we did not accrue interest on. So in summary, our total delinquencies are down 23% from $1.23 billion last quarter to $954 million this quarter, which is significant progress, again, due to the tremendous success we had in modifying and resolving loans and our continued strong collection efforts.

273.    The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Arbor failed to maintain adequate underwriting standards and disregarded its own stated guidelines; (ii) as a result, the Company originated a high volume of multifamily bridge

loans that were at a heightened risk of default; (iii) in violation of GAAP, the Individual Defendants failed to record adequate CECL to account for the Company's deviations from its underwriting standards; (iv) as a result, Arbor's reported net income was materially overstated throughout the Relevant Period; (v) the Individual Defendants falsified and/or manipulated property appraisals to conceal the Company's divergence from its underwriting standards; (vi) the Company's LTV ratios were materially understated; (vii) Arbor lacked adequate internal controls related to its risk rating system and LTV ratios; (viii) Arbor stopped requiring rate caps for "stronger performing deals" around mid- to late-2021, and, by early-2022, the Company stopped requiring rate caps on any bridge loans; (ix) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

## THE TRUTH IS REVEALED

274.    The truth with respect to the Company's inadequate underwriting standards, accounting violations, and ineffective internal controls emerged gradually through a series of partially corrective disclosures, beginning late 2023.

275.    On November 16, 2023, Viceroy issued a report (the "November 16, 2023 Report") which concluded, after a review of all of the Company's multifamily bridge loans comprising its CLOs, constituting roughly two-thirds of Arbor's Structured portfolio, that the Company's entire loan book was distressed and default was "inevitable" due to rising interest rates, declining property values, and impending maturity dates without viable refinancing options. In its report, Viceroy concluded that "[i]n this industry plagued with delusion and bad decisions, Arbor stands out as the worst of the worst."

276.    The November 16, 2023 Report revealed that, contrary to the Individual

Defendants' public statements, Arbor did not require rate caps for all of its borrowers. Further, according to Viceroy, the properties underlying the Company's loans were not generating sufficient cash flow to cover their debt payments. The November 16, 2023 Report further stated that Arbor had extended billions of dollars in bridge loans to "finfluencers" and real estate "guru" syndicators who lacked real estate investment backgrounds, reporting that "Arbor's loans are not being made to the most sophisticated or financially sound borrowers, and some of them have already hit hard times."

277.    On this news, the price of Arbor stock declined 11.56% in one day, from a close of $13.84 per share on November 15, 2023 to a close of $12.24 per share on November 16, 2023.

278.    On December 5, 2023, Viceroy published another report, titled "Arbor – Jacksonville Case Study" (the "December 5, 2023 Report"), providing further details into a syndicated portfolio in Jacksonville, Florida, highlighting the substantial overvaluation of the Company's underlying assets. The December 5, 2023 Report revealed that "[w]histleblowers have reached out to Viceroy en-masse to provide evidence and public citations of current, distressed Arbor deals and underlying assets" and that "the information asymmetry between real estate industry professionals and Arbor's investors is vast."

279.    On this news, the price of Arbor stock declined 5.12% in one day, from a close of $13.86 per share on December 4, 2023 to a close of $13.15 per share on December 6, 2023.

280.    On February 16, 2024, during the Company's earnings call for the fourth quarter of 2023, Defendant Kaufman attempted to assuage investor concerns by minimizing the allegations in the reports, claiming that "the facts, assumptions predicated future events and marketing conditions as well as conclusions in these reports are exaggerated, l[aced] with incomplete and inaccurate data, it's slanted only to provide a negative view on Arbor and again, purely for personal

gain." Defendant Kaufman continued, stating:

> It is also very important to emphasize that a significant portion of Arbor's lending is multifamily focused specifically in the workforce housing part of the market. As we all know, Fannie Mae and Freddie Mac have had a specific mandate to address the workforce/affordable housing needs, which is a major issue in the United States, making Arbor a great partner. This product requires a level of -- a high level of management, tremendous expertise, which we have been effective at for decades, because this product may not have the same curb appeal as other multifamily product types. We've been criticized for a core part of our business that we have been extremely effective at, and we'll continue to fulfill a very important mandate for the federal agencies as well as the social needs for society.

281.    Defendant Kaufman further chose to emphasize that "as of today," Arbor's CLO delinquency rates for December 2023 and January 2024 were down since last reported by Viceroy, claiming that "[t]his is a perfect example of using select data as of a point in time, does not contain the full picture or represent the industry's focus, only to inject fear into the market for personal gain. We urge our long-term shareholders to ignore these one-sided self-motivated reports and focus only on our results and public disclosures and the fact that we've consistently outperformed our peers." Further, when specifically questioned with respect to the quality of the Company's loans or borrowers, Defendant Kaufman stated:

> ***Well, clearly, our agenda is when we do a bridge loan, it's for the sole purpose of creating an agency loan. You have to have a quality sponsor and you have to have a quality asset.*** So our idea, of course, is that every sponsor that we take on is going to perform correctly, not all sponsors do that and a lot of this, sometimes they'll be a sponsor who couldn't hit his business plan or who had all the problems or isn't what we thought and they don't qualify, that's just the way it goes. Nobody is perfect. We're not perfect.
>
> With respect to the assets, if you're improving an asset, you got to approve that asset and you got to get it up to industry standards and the agency standards. If it doesn't, it won't meet that agency eligible. So if we have a $16 billion portfolio, not all $16 billion is going to make that mark. ***I mean, I think, of 75%, 80% of them get to an agency status and convert, that's pretty good***. In other cases, when they don't do that, the assets will be sold or put into new ownership who will get that asset up to spec. So that's kind of the way we look at the world. It's not a perfect situation where every asset that we take in ends up meeting our execution.

282.    On May 3, 2024, Arbor released its financial earnings for the first quarter of 2024 and reported that the Company had modified 39 multi-family bridge loans totaling nearly $1.9 billion by extending maturity dates and providing temporary rate relief in exchange for agreements by borrowers to pay down principal and buy new rate caps. The Company additionally revealed that Arbor bought out $223 million in non-performing loans from its CLOs.

283.    On May 9, 2023, Viceroy issued a report titled "Arbor Realty Trust – Fraud," which disclosed that the Company had fraudulently overstated the value of its loan book through undisclosed, off-balance sheet, related party transactions. Specifically, Viceroy alleged that the Company financed purchases of assets from its own foreclosures of distressed Arbor bridge loans, via off-balance sheet entities controlled by former Company associates, and financed with Company equity capital, allowing Arbor to avoid writing down its Structured loans.

284.    On this news, the price of Arbor stock declined 4.9% in one day, from a close of $13.50 per share on May 8, 2024 to a close of $12.84 per share on May 9, 2024.

285.    Finally, on July 12, 2024, Bloomberg published an article titled "Arbor Realty Probed by DOJ Over Lending Practices, Loan Book," revealing that the Manhattan U.S. Attorney's Office and the Federal Bureau of Investigation ("FBI") in New York had launched investigations into Arbor's "lending practices and the Company's claims about the performance of their loan book."

286.    On this news, the price of Arbor stock declined 17.33% in one day, from a close of $15.53 per share on July 11, 2024 to a close of $12.89 per share on July 12, 2024.

**FIDUCIARY DUTIES OF INDIVIDUAL DEFENDATNS**

287.    By reason of their positions as officers and directors of Arbor, and because of their ability to control the business and corporate affairs of Arbor, the Individual Defendants owed

Arbor and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Arbor in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Arbor and its shareholders so as to benefit all shareholders equally.

288.    Each director and officer of the Company owes to Arbor and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

289.    The Individual Defendants, because of their positions of control and authority as officer and directors of Arbor, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

290.    To discharge their duties, the officers and directors of Arbor were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

291.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Arbor, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

292.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the New

York Stock Exchange, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's supply chain issues resulting from regulations in the travel retail industry. The Individual Defendants also had a fiduciary duty to disclose the material information necessary to prevent other public statements, including those in its regulatory filings with the SEC, from being materially false, so that the market price of the Company's common stock was based upon truthful, accurate, and fairly presented information.

293.    To discharge their duties, the officers and directors of Arbor were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Arbor were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Arbor's own Code of Conduct;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Arbor conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Arbor and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Arbor's operations would comply with all applicable laws and Arbor's public statements, financial statements and regulatory filings were accurate;

(f)      adequately monitor the Company's officers and employees to ensure their public statements about the Company were complete and accurate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

294.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Arbor.

295.    Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## THE CODE OF CONDUCT

296.    Arbor maintains a Code of Conduct that begins with a message from Defendant

Kaufman, which states, in pertinent part:

> The good name and reputation of Arbor Realty Trust, Inc. (the "Company") are a result of the dedication and hard work of its directors, officers, and employees. Together, we are responsible for preserving and enhancing this reputation, a task that is fundamental to our continued well-being. Our goal is not just to comply with the laws and regulations that apply to our business; we also strive to abide by the highest principles of business ethics.

297. The Code of Conduct stated that it applies to "[a]ll employees, officers and directors" and states the following with respect to violations of the Code of Conduct:

> The Company intends to use every reasonable effort to prevent the occurrence of conduct not in compliance with the Code and to halt any such conduct that may occur as soon as reasonably possible after its discovery. Subject to applicable law and agreements, the Company's personnel who violate the Code and other policies and procedures of the Company may be subject to disciplinary action, including summary discharge. Such disciplinary action will not waive the Company's right to take additional appropriate legal action.

298. The Code of Conduct includes a commitment "to the highest standards of business conduct in our relationships with our customers, suppliers, stockholders, directors, officers, employees, governmental and regulatory authorities and others. This requires that we conduct our business in accordance with all applicable laws and regulations and the highest standards of business ethics."

299. With respect to conflicts of interest, the Code of Conduct states the following, in pertinent part:

> A conflict of interest occurs when your private interests interfere in any way, or even appear to interfere, with the interests of the Company. A conflict situation can arise when you take actions or have interests that make it difficult for you to perform your work for the Company objectively and effectively. Your obligation to conduct the Company's business in an honest and ethical manner includes the ethical handling of actual or apparent conflicts of interest between personal and business relationships.

300. With respect to Arbor's corporate assets, the Code of Conduct states that "[w]e each have a duty to protect the Company's assets and ensure their efficient use. Theft, carelessness and

waste have a direct impact on the Company's profitability."

301.    In a subsection titled "The Company's Books and Records," the Code of Conduct

states the following:

> The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions. You must complete all documents required or requested by the Company accurately, truthfully and in a timely manner, including all travel and expense reports. When using business expense accounts, you must document and record all information accurately. If you are not sure whether a certain expense is legitimate, ask your supervisor or the General Counsel.
>
> When applicable, documents must be properly authorized in accordance with the Company's policies and procedures. You must record the Company's financial activities in compliance with all applicable laws and accounting practices. The making of false or misleading entries, records or documentation is strictly prohibited. You must never create a false or misleading report or make a payment or establish an account on behalf of the Company with the understanding that any part of the payment or account is to be used for a purpose other than as described by the supporting documents. Business records and communications often become public, and you should avoid exaggeration, derogatory remarks, guesswork or inappropriate characterizations of people and companies that could be misunderstood. This applies to e-mail, internal memos, formal reports and all other business communications.

302.    In a section titled "FAIR DEALING," the Code of Conduct states the following, in

pertinent part, that "[t]he Company depends on its reputation for quality, service and integrity. The

way we deal with our customers, competitors and suppliers molds our reputation, builds long-term

trust and ultimately determines our success. You should endeavor to deal fairly with the

Company's customers, suppliers, competitors and employees."

## ARBOR'S AUDIT COMMITTEE CHARTER

303.    Arbor maintains an Audit Committee Charter (the "Charter"), which states that the

purpose of the Audit Committee is to:

> [P]rovide assistance to the Board in fulfilling its duties with respect to matters involving the accounting, auditing, financial reporting, internal control and legal compliance functions of the Corporation and its subsidiaries, including, without limitation, (a) assisting the Board's oversight of (i) the integrity of the Corporation's

financial statements, (ii) the Corporation's compliance with legal and regulatory requirements, including public disclosure requirements, (iii) the Corporation's independent auditors' qualifications and independence, and (iv) the performance of the Corporation's independent auditors and the Corporation's internal audit function, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Corporation's annual proxy statement.

304.    In a subsection titled "Oversight of Annual Audit and Quarterly Reviews," the

Audit Committee Charter tasks the Audit Committee with the following responsibilities:

To review and discuss with the independent auditors their annual audit plan, including the timing and scope of audit activities, and monitor such plan's progress and results during the year.

To review with management, the Corporation's independent auditors and the person or firm responsible for the Corporation's internal audit function, the following information which is required to be reported by the independent auditor: (a) all critical accounting policies and practices to be used; (b) any critical audit matters arising from the current period audit; (c) all alternative treatments of financial information that have been discussed by the independent auditors and management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors; and (d) all other material written communications between the independent auditors and management, such as any management letter and any schedule of unadjusted differences.

To review with management, the Corporation's independent auditors and, if appropriate, the person or firm responsible for the Corporation's internal audit function, the following: (a) the Corporation's annual audited financial statements and quarterly financial statements, including the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and any major issues related thereto; (b) major issues regarding accounting principles and financial statements presentations, including any significant changes in the Corporation's selection or application of accounting principles; (c) any analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles methods on the Corporation's financial statements; and (d) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Corporation.

To review on a regular basis with the Corporation's independent auditors any problems or difficulties encountered by the independent auditors in the course of

any audit work, including management's response with respect thereto, any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management. In connection therewith, the Committee should review with the independent auditors the following: (a) any accounting adjustments that were noted or proposed by the independent auditors but were rejected by management (as immaterial or otherwise); (b) any communications between the audit team and the independent auditor's national office respecting auditing or accounting issues presented by the engagement; and (c) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Corporation.

305.    In a subsection titled "Oversight of the Financial Reporting Process and Internal Controls," the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

To review the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures on a regular basis, including (a) the responsibilities, budget, compensation and staffing of the Corporation's internal audit function, through inquiry and discussions with the Corporation's independent auditors, management and the person or firm responsible for the Corporation's internal audit function; (b) the yearly report prepared by management, and attested to by the Corporation's independent auditors, assessing the effectiveness of the Corporation's internal control over financial reporting and stating management's responsibility for establishing and maintaining adequate internal control over financial reporting prior to its inclusion in the Corporation's Annual Report on Form 10-K as required by the rules of the SEC; and (c) the Committee's level of involvement and interaction with the Corporation's internal audit function, including the Committee's line of authority and role in appointing and compensating employees in the internal audit function.

To review with the Corporation's chief executive officer, chief financial officer and independent auditors, periodically, the following: (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Corporation's ability to record, process, summarize and report financial information; and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal control over financial reporting.

To discuss guidelines and policies governing the process by which senior management of the Corporation and the relevant departments of the Corporation, including the internal auditing department or the person or firm responsible for the Corporation's internal audit function, assess and manage the Corporation's exposure to risk, as well as the Corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures.

To review with management the progress and results of all internal audit deemed necessary or appropriate by the Committee, assign additional projects, and, when internal audit projects to the person or firm responsible for the Corporation's internal audit function. To review with management the Corporation's administrative, operational accounting internal controls, including any special audit steps adopted in light of the and discovery of material control deficiencies.

To receive periodic reports from the Corporation's independent auditors, management and the person or firm responsible for the Corporation's internal audit function to assess the impact on the Corporation of significant accounting or financial reporting developments that may have a bearing on the Corporation.

To review and discuss with the independent auditors the results of the year- end audit of the Corporation, including any comments or recommendations of the Corporation's independent auditors and, based on such review and discussions and on such other considerations as it determines appropriate, recommend to the Board whether the Corporation's financial statements should be included in the Annual Report on Form 10-K.

To review the type and presentation of information to be included in the Corporation's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Corporation to analysts and rating agencies (which review may be done generally (i.e., discussion of the types of information to be disclosed and type of presentations to be made), and the Committee need not discuss in advance each earnings release or each instance in which the Corporation may provide earnings guidance).

## DAMAGES TO THE COMPANY

306.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has expended and will continue to expend many millions of dollars.

307.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

308.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts

associated with the Company's violations.

309.    As a direct and proximate result of the Individual Defendants' conduct, the Company has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

310.    Plaintiff brings this action derivatively in the right and for the benefit of Arbor to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties as directors and/or officers of Arbor.

311.    The Company is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

312.    Plaintiff will adequately and fairly represent the interests of Arbor and its stockholders in enforcing and prosecuting its rights.

313.    Plaintiff is a current shareholder of Arbor and has been a continuous shareholder of the Company's common shares at all relevant times.

314.    At the time this action was commenced, the Board was comprised of the following ten individuals: Defendants Kaufman, Green, Bacon, Effron, Farrell, Lazar, Martello, Schwartz, Tsunis, and Wilkens (the "Director Defendants"), as well as Non-Parties Tsunis and Wilkens.

315.    A pre-suit demand on the Board is futile and, therefore, excused. Plaintiff is required to show that a majority of directors of the current Board cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this

action is not necessary because such a demand would be a futile act.

316.    Additional reasons that demand on Defendant Kaufman is futile follow. Defendant Kaufman has served as the Company's Chairman of the Board, CEO, and President since 2003. The Company provides Defendant Kaufman with his principal occupation, for which he receives significant compensation as detailed above. As a trusted Company director, Defendant Kaufman conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Kaufman breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Kaufman is futile and, therefore, excused.

317.    Additional reasons that demand on Defendant Bacon is futile follow. Defendant Bacon has served as a Company director since 2020. The Company provides Defendant Bacon with significant compensation as detailed above. As a trusted Company director, Defendant Bacon conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Bacon breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Bacon is futile and, therefore, excused.

318.    Additional reasons that demand on Defendant Effron is futile follow. Defendant Effron has served as a Company director since 2021. The Company provides Defendant Effron with significant compensation as detailed above. As a trusted Company director, Defendant Effron conducted little, if any, oversight of the Company's engagement in the scheme to make false and

misleading statements, consciously disregarded her duties to monitor controls over reporting, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Effron breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Effron is futile and, therefore, excused.

319.    Additional reasons that demand on Defendant Farrell is futile follow. Defendant Farrell has served as a Company director since 2018. The Company provides Defendant Farrell with significant compensation as detailed above. As a trusted Company director, Defendant Farrell conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Farrell breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Farrell is futile and, therefore, excused.

320.    Additional reasons that demand on Defendant Green is futile follow. Defendant Green has served as a Company director since 2012. The Company provides Defendant Green with significant compensation as detailed above. As a trusted Company director, Defendant Green conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Green breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Green is futile and, therefore, excused.

321.    Additional reasons that demand on Defendant Lazar is futile follow. Defendant Lazar has served as a Company director since 2003. The Company provides Defendant Lazar with significant compensation as detailed above. As a trusted Company director, Defendant Lazar

conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Lazar breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Lazar is futile and, therefore, excused.

322.    Additional reasons that demand on Defendant Martello is futile follow. Defendant Martello has served as a Company director since 2003. The Company provides Defendant Martello with significant compensation as detailed above. As a trusted Company director, Defendant Martello conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Martello breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Martello is futile and, therefore, excused.

323.    Additional reasons that demand on Defendant Schwartz is futile follow. Defendant Schwartz has served as a Company director since 2018. The Company provides Defendant Schwartz with significant compensation as detailed above. As a trusted Company director, Defendant Schwartz conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Schwartz breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Schwartz is futile and, therefore, excused.

324.     Additional reasons that demand on Wilkens is futile follow. Wilkens has served as a member of the Board since 2023. The Company provides Wilkens with significant compensation as detailed above. As such, Wilkens cannot independently or impartially consider any demand adverse to the Director Defendants serving on the Compensation Committee who determine Wilkens' compensation. Wilkens therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Wilkens is thus futile.

325.     Additional reasons that demand upon the Board is futile follow.

326.     Defendants Bacon, Effron, Farrell, Green, and Lazar serve as members of the Audit Committee and/or served as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with, *inter alia*, the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. However, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions. Therefore, Defendants Bacon, Effron, Farrell, Green, and Lazar cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

327.     The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants

could not fairly and fully prosecute such a suit even if they instituted it.

328.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.

329.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Director Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Arbor stock and stock options they held.

330.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Arbor's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

331.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face

a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

332.     The acts complained of herein constitute violations of fiduciary duties owed by Arbor's officers and directors, and these acts are incapable of ratification.

333.     The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Arbor. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by Arbor against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Arbor, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

334.     If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Arbor to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

335.     For all of the reasons set forth above, the current directors cannot consider a

demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## **FIRST CLAIM**

### **Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

336. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

337. The Director Defendants solicited the 2023 and 2024 Proxy Statements containing materially false and misleading statements and/or omissions.

338. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

339. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a- 9.

340. Under the direction and watch of the Director Defendants, the 2023 and 2024 Proxy Statements failed to disclose that: (i) the Individual Defendants made and/or caused the Company to make the false and misleading statements and omissions alleged herein; and (ii) the Board failed

to adequately carry out its risk management and oversight obligations and failed to adhere to the Code of Conduct.

341.    The 2023 and 2024 Proxy Statement also failed to disclose that: (i) Arbor failed to maintain adequate underwriting standards and disregarded its own stated guidelines; (ii) as a result, the Company originated a high volume of multifamily bridge loans that were at a heightened risk of default; (iii) in violation of GAAP, the Individual Defendants failed to record adequate CECL to account for the Company's deviations from its underwriting standards; (iv) as a result, Arbor's reported net income was materially overstated throughout the Relevant Period; (v) the Individual Defendants falsified and/or manipulated property appraisals to conceal the Company's divergence from its underwriting standards; (vi) the Company's LTV ratios were materially understated; (vii) Arbor lacked adequate internal controls related to its risk rating system and LTV ratios; (viii) Arbor stopped requiring rate caps for "stronger performing deals" around mid- to late-2021, and, by early-2022, the Company stopped requiring rate caps on any bridge loans; (ix) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

342.    In exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 and 2024 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination.

343.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2023 and 2024 Proxy Statements.

344.    Plaintiff on behalf of Arbor has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

345.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

346.    The Individual Defendants owed Arbor fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

347.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

348.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.

349.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate

internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Arbor's securities.

350.    These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

351.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

352.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

353.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

354.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Arbor.

355.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Arbor that was tied to

the performance or artificially inflated valuation of Arbor or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

356.    Plaintiff, as a shareholder and a representative of Arbor, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

357.    Plaintiff on behalf of Arbor has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

358.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

359.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

360.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and colleting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

361.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

362.    Plaintiff on behalf Arbor has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.     Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.     Awarding punitive damages;

D.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: April 18, 2025                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Phillip Kim
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*

## **VERIFICATION**

       I, Marty Kessler am a plaintiff      in the within action. I have   reviewed    the allegations  made   in  this   shareholder   derivative  complaint,  know  the  contents thereof,  and   authorize   its   filing.   To those allegations     of  which    I have  personal knowledge,   I  believe  those    allegations  to be true.   As to   those  allegations   of  which I  do  not  have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct. Executed th4i/s14/2025  .

*marty kessler*
573D9E4800284I9...

Marty Kessler